The PENSION BENEFIT GUARANTY CORPORATION, as Trustee of the Bollinger Corporation Salaried Employees Pension Plan and the Bollinger Corporation Union Employees Pension Plan and as Trustee of the Portersville Equipment Company Union Employees Pension Plan and the Portersville Equipment Company Salaried Employees Pension Plan, Plaintiff,

v.

Morton J. GREENE and Thomas R. Allen, Jr., as individuals and as former trustees of the Bollinger Corporation Salaried Employees Pension Plan, the Bollinger Corporation Union Employees Pension Plan, the Portersville Equipment Company Union Employees Pension Plan, and the Portersville Equipment Company Salaried Employees Pension Plan, and Economy Industrial Properties, Defendants.

Civ. A. No. 80–688.

United States District Court, W.D. Pennsylvania.

March 16, 1983.

Asst. U.S. Atty. Craig R. McKay, Pittsburgh, Pa., and Pension Ben. Guar. Corp., Washington, D.C., for plaintiff.

William A. Hoffman, B.A. Karlowitz, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

BLOCH, District Judge.

Plaintiff, the Pension Benefit Guaranty Corporation (hereinafter referred to as "PBGC"), is the government body created by the Employee Retirement Income Security Act of 1974 (hereinafter referred to as "ERISA") to administer the Mandatory Pension Plan Termination Program.[1] Defendants Morton Greene (hereinafter referred to as "Greene") and Thomas R. Allen, Jr. (hereinafter referred to as "Allen") are residents of Pennsylvania. At all times relevant to this action, Greene and Allen were trustees under four pension plans and general partners in defendant Economy Industrial Properties (hereinafter referred to as "Economy"). This Court has jurisdiction under ERISA, 29 U.S.C. § 1132.

The plaintiff's principal task under ERISA is to guarantee the payment of pension benefits to participants of terminated pension plans. The two individual defendants, Greene and Allen, were officers in five related Pennsylvania corporations and trustees of the trusts established to fund the four pension plans of those corporations. The pension plans were all terminated in 1976, and plaintiff was subsequently appointed as statutory trustee of the plans. Plaintiff brings this action to recoup certain monies from the defendants as follows: principal and interests on loans which the pension plans allegedly made to the corporations while the individual defendants were trustees; uncollected employee contributions; rental payments paid by two of the plans to Economy pursuant to, what plaintiff contends was, an illegal lease agreement; and certain interest payments from a plan investment which were sent to defendant Greene and which defendant Greene allegedly converted to his own use.

The defendants all deny any liability to plaintiff and assert two counterclaims of their own. First, defendant Economy alleges that the lease agreement between the plans and Economy was valid and demands the balance of the rental payments owed. Second, the defendants Greene and Allen claim that, in 1976, they requested that plaintiff provide them with a statement of their vested benefits pursuant to 29 U.S.C.

---

1. The PBGC was established pursuant to 29 U.S.C. § 1302.

§ 1025(a).[2] Defendants Greene and Allen further claim that plaintiff has failed and refused to provide the requested information and that this makes plaintiff liable to defendants Greene and Allen for $100 per day from the date of such refusal or failure pursuant to 29 U.S.C. § 1132(c).[3]

At the pretrial conference, the parties indicated to the Court that the matter could be decided on motions for summary judgment. The Court agreed, and the parties have filed cross motions for summary judgment.

The parties have stipulated to the facts of this case, and that stipulation is attached to this Opinion as an exhibit. However, in order to enhance the comprehendibility of this Opinion, the Court summarizes the major facts at this point. The plaintiff is a wholly-owned United States government corporation created by ERISA, 29 U.S.C. § 1302, to administer the mandatory pension plan to termination insurance program created by Title IV of ERISA.

This action involves the following four Pennsylvania corporations: (1) Kincaid Industries, Inc. (hereinafter referred to as "Kincaid"); (2) Bollinger Corporation (hereinafter referred to as "Bollinger"); (3) Portersville Equipment Company (hereinafter referred to as "Portersville"); and (4) Superior Wall Products Company (hereinafter referred to as "Superior"). Moreover, it also involves four pension plans, namely: (1) the Bollinger Corporation Union Employees Pension Plan (hereinafter referred to as the "Bollinger Union Plan"); (2) the Bollinger Corporation Salaried Employees Pension Plan (hereinafter referred to as the "Bollinger Salaried Plan"); (3) the Portersville Equipment Company Union Employees Pension Plan (hereinafter referred to as the "Portersville Union Plan"); and (4) the Portersville Equipment Salaried Employees Pension Plan (hereinafter referred to as the "Portersville Salaried Plan.").

At all times relevant to this action, Greene was a director, officer, or shareholder of Kincaid, Bollinger, and Portersville, and a half-partner in Economy, and Allen was a director, officer, or shareholder of Kincaid, Bollinger, and Portersville, and a half-partner in Economy. Superior was a wholly-owned subsidiary of Kincaid. Greene and Allen became trustees of the trusts for the two Bollinger plans in the mid-1960's, and of the trusts for the two Portersville plans in 1970. They attempted to resign their trusteeships in 1974, but, as will be discussed at a later point in this Opinion, their attempted resignations were not successful. It must also be noted that Greene, Allen, Kincaid, Bollinger, and Superior were all parties in interests with respect to the two Bollinger plans pursuant to 29 U.S.C. § 1002(14), and Greene, Allen, Kincaid, Portersville, and Superior were all parties in interests with respect to the two Portersville plans pursuant to the same section.

All four corporations suffered financial difficulties in the early to middle 1970's, and Bollinger filed for bankruptcy in March of 1976. Portersville also filed for bankruptcy in April of 1976.

The Bollinger Union Plan terminated in December, 1976, and the Bollinger Salaried Plan terminated in February, 1977. Likewise, the Portersville Union and Salaried

---

**2.** Title 29 U.S.C. § 1025(a) provides as follows: "Each administrator of an employee pension benefit plan shall furnish to any plan participant or beneficiary who so requests in writing, a statement indicating, on the basis of the latest available information—(1) the total benefits accrued, and (2) the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which benefits will become nonforfeitable."

**3.** Title 29 U.S.C. § 1132(c) provides as follows: "Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

Plans terminated in July, 1976. The plaintiff subsequently became statutory trustee of all plans.

In addition to the stipulation of facts, the parties have filed affidavits, depositions, and a 644-page appendix that contains 62 joint exhibits, which the Court refers to in this Opinion. The Court, after carefully considering the motions, the stipulated facts and submitted materials, and the briefs of the parties, hereby grants the plaintiff's motion for summary judgment and denies defendants' motion.

The plaintiff's claim contains both pre-ERISA and ERISA violation. Accordingly, the Court deems it appropriate to discuss the pre-ERISA and ERISA violations separately below. Moreover, as stated above, the defendants assert counterclaims which will also be discussed in a separate section of this Opinion.

### A. Pre-ERISA Claims

The plaintiff alleges that Greene and Allen violated their fiduciary responsibilities as trustees of the trusts in the 1971–74 period in violation of Pennsylvania trust law.[4] In response to these claims, the defendants assert two major defenses. First, the defendants assert that the provisions of ERISA are inapplicable to most of the plaintiff's claims.[5] Second, the defendants contend that the six-year statute of limitations, under either Pennsylvania law[6] or ERISA,[7] bars any claim against them which arises from conduct that occurred prior to May 22, 1974.[8] The Court deems it appropriate to dispose of defendants' contentions before addressing the merits of plaintiff's pre-ERISA claims because resolution of these two contentions at this point will help

facilitate orderly discussion and understanding of the pre-ERISA claims.

It appears that defendants' first contention—that the provisions of ERISA are inapplicable to several of plaintiff's claims—is acceptable to plaintiff since plaintiff bases its claims for pre-1975 conduct on state law. However, the Court deems it necessary to address the issue because of the jurisdictional question which it raises.

■ Title 29 U.S.C. § 1144(b)(1) provides that ERISA "shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." In *Martin v. Bankers Trust Co.*, 565 F.2d 1276 (4th Cir.1977), the plaintiff brought an action in federal court alleging an ERISA violation for acts which occurred before the effective date of ERISA. The Fourth Circuit held that ERISA's substantive provisions did not apply to the claim. The Third Circuit has also held that the language of 29 U.S.C. § 1144(b)(1) compels the conclusion that acts or omissions which occurred prior to the effective date of ERISA are not controlled by that Act. *Reuther v. Trustees of Trucking Employees of Passaic and Bergen County Welfare Fund*, 575 F.2d 1074, 1078 (3d Cir.1978). Thus, plaintiff's claims that arise from acts or omissions that occurred prior to the effective date of ERISA are controlled by state law, and not by ERISA. This gives rise to the question of whether state law claims can be heard in the same case as ERISA claims.

The answer to this question is found in a Second Circuit opinion and a decision of this Court relying upon that Second Circuit decision. In *Morrissey v. Curran*, 567 F.2d 546 (2d Cir.1977), the defendants improperly administered a pension plan by: (1) misappropriating funds for personal use, (2) improvi-

---

**4.** At this point, the Court notes that the effective date of ERISA was January 1, 1975. 29 U.S.C. § 1114(a).

**5.** Many of plaintiff's claims arise from conduct which occurred prior to January 1, 1975, the effective date of ERISA.

**6.** The defendants point to the six-year general statute of limitations under 42 Pa.C.S.A. § 5527(6).

**7.** The defendants cite 29 U.S.C. § 1113 which provides for a six-year statute of limitations under ERISA.

**8.** The complaint was filed on May 22, 1980; six years prior to the date of complaint filing was May 22, 1974.

dently investing over $1 million in a foreign venture, and (3) paying a large sum to the administrator of the plan. *Id.* at 547. The district court dismissed the suit finding that all acts complained of occurred pre-ERISA. The Second Circuit reversed, reasoning that ERISA imposed a continuing duty to review and liquidate improvident investments. Thus, as to at least one of the claims, the defendants' fiduciary duty continued after ERISA. The Court held that that particular claim was within the "exclusive jurisdiction of that Act." *Id.* at 549. Moreover, the Second Circuit, relying upon the United States Supreme Court case of *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), indicated that the district court could take pendent jurisdiction over the other claims under state law. *Id.* n. 11, 96 S.Ct. 2421 n. 11.

This reasoning was adopted by this Court in *Trustees of the Retirement Benefit Plan v. Equibank,* 487 F.Supp. 58 (W.D.Pa.), *appeal dismissed,* 639 F.2d 772 (3d Cir.1980). In the *Equibank* case, the Court held that the significance of *Morrissey* is two-fold. First, it highlights the difficulty of attempting to bifurcate pre-ERISA acts from post-ERISA acts.[9] *Id.* 487 F.Supp. at 62. Second, even though pre-ERISA acts or omissions are separate state law claims, *Morrissey* indicates that *a court may assume pendent jurisdiction. Id.*

In this case, the Court believes that plaintiff has raised valid ERISA claims and violations.[10] Accordingly, the Court can assume pendent jurisdiction over plaintiff's pre-ERISA, state law claims.[11]

Next, the Court disposes of defendants' statute of limitations argument, which lacks merit. As stated, the defendants contend that the six-year statute of limitations, under both Pennsylvania law and ERISA, bars conduct that occurred prior to May 22, 1974. The defendants raise the ERISA statute of limitations even though they acknowledge that ERISA was not in effect prior to 1975. The plaintiff asserts that the ERISA statute of limitations does not apply, and the Court agrees. This leaves the Pennsylvania statute of limitations to contend with.

Greene and Allen became trustees of the trusts for the Bollinger plans in the middle 1960's and of the Portersville plans in 1970. Stipulation of Facts ¶ 15. They served in this capacity up until the effective date of ERISA.[12] Greene and Allen were named trustees in connection with written, expressed[13] trust funds and trust agreements. *See generally* Joint Appendix, Joint Exhibits 1–4 (pp. 1–73) and Joint Exhibits 8–13 (pp. 118–171). Accordingly, Greene and Allen were "express trustees."

Under Pennsylvania law, an express trustee may not plead the statute of limitations as a defense. *Sherwin v. Oil City National Bank,* 229 F.2d 835, 836 n. 2 (3d Cir.1956); *Pennsylvania Co. for Insurances on Lives v. Ninth Bank & Trust Co.,* 306 Pa. 148, 154, 158 A. 251 (1932). Thus, Greene and Allen, as express trustees, cannot plead the statute of limitations.

Alternatively, even if the statute of limitations defense were available to Greene and Allen, the statute does not be-

---

9. As the Court stated, "[m]any pre-ERISA investment decisions can result in post-enactment liability due to a 'continuing duty' to oversee improvident investments." *Trustees of the Retirement Benefit Plan, supra,* 487 F.Supp. at 62.

10. These will be discussed in the next section of this Opinion.

11. The plaintiff's amended complaint did raise pendent jurisdiction. Moreover, the Court is also cognizant of the fact that it can hear the claims under 28 U.S.C. § 1345 (United States as plaintiff), which plaintiff also raises.

12. There is a dispute as to whether Greene and Allen effectively resigned as trustees at the effective date of ERISA, which will be discussed in the next section of this Opinion.

13. An express trust is "a trust created or declared in express terms, and usually in writing, as distinguished from one inferred by the law from the conduct or dealings of the parties. A trust created for specific purposes...." Black's Law Dictionary 1354 (5th ed. rev. 1979).

gin to run until the cestui knows, or under the circumstances ought to know, of the facts that give rise to the cause of action. *United States v. Rose,* 346 F.2d 985 (3d Cir.1965); *Pennsylvania Co. for Insurances on Lives, supra,* 306 Pa. at 155, 158 A. 251. The plaintiff was not appointed statutory trustee of the Portersville Plans until December of 1976 and was not appointed statutory trustee of the Bollinger Plans until May of 1977. Joint Appendix, Joint Exhibits 8–11 (pp. 117–128). Accordingly, plaintiff was not in a position to know of the facts which give rise to this action until, at the earliest, December of 1976.[14] Plaintiff filed the action in May of 1980, well within the six-year statute of limitations period. In sum, the statute of limitations defense is not available to Greene and Allen, but even if it was, plaintiff has filed this action in a timely fashion.

Having disposed of these two issues, the Court turns its attention to the plaintiff's state law claims. Plaintiff claims that defendants Greene and Allen breached their fiduciary duty under state law by making certain loans, on behalf of the plans, and by failing to collect, or take other action in connection with, the failure of Bollinger and Portersville to make contributions to the respective pension plan trust funds. These claims will be discussed in more detail below.

### 1. The Loans

The Court first addresses the alleged illegal loan transactions. In late 1970, the first loan transaction took place. In that transaction, Greene and Allen[15] agreed, on behalf of the plans to loan Superior $39,200.[16] Stipulation of Facts ¶ 28. In return, Superior gave the plans a promissory note, which provided for 9½ interest per annum and 16 quarterly payments, and a security in all of its machinery and equipment, inventory, and accounts receivable. Joint Appendix, Joint Exhibit 28 (p. 304). The financing statement filed in this transaction indicated that the collateral for the loan was free and clear of all liens and encumbrances. Joint Appendix, Joint Exhibit 28 (p. 307). However, as the plaintiff correctly points out, the inventory pledged as collateral was, in fact, encumbered because it had previously been pledged as collateral in another transaction. Joint Appendix, Joint Exhibit 6 (p. 91).

Between June and September, 1972, the Portersville Union Plan loaned an additional $30,800 to Superior. Joint Appendix, Joint Exhibit 28 (p. 302). No new note was signed, or additional security given, for this second loan.[17] Greene Deposition of October 26, 1981, p. 137. On September 11, 1975, Superior paid the entire principal balance of $9,925[18] due to the Bollinger Union Plan. Stipulation of Facts ¶ 28; Joint Appendix, Joint Exhibit 28 (p. 302). However, by February 17, 1976, the amount of $78,-175,[19] which includes principal and interest amounts, remained outstanding to the other three plans. Joint Appendix, Joint Exhibit

14. The Court believes that it was not until this time that plaintiff was in the position to carefully scrutinize the trust records to ascertain the proper course of action.

15. It should be noted at this point that Greene and Allen were both trustees of the plans and directors, officers, or shareholders of Kincaid, which wholly-owned Superior. Stipulation of Facts, ¶¶ 3, 4, 5, and 15.

16. The loan consisted of the following contributions from each plan: (1) $9,925 from the Bollinger Union Plan; (2) $16,800 from the Bollinger Salaried Plan; (3) $10,475 from the Portersville Union Plan; and (4) $2,000 from the Portersville Salaried Plan. Joint Appendix, Joint Exhibit 28 (p. 304).

17. Greene testified, at a deposition, that the original security agreement was "intended ... to cover additional advances." Greene deposition of October 26, 1981, p. 137.

18. It appears to the Court that there was a certain amount of interest due on this principal amount that was not paid (the entire payment was applied to principal), but the plaintiff does not make a claim for this interest amount.

19. The $78,175 figure is comprised of the following amounts, which include both principal and interest: (1) $23,583 due the Bollinger Salaried Plan; (2) $51,784.50 due the Portersville Union Plan; and (3) $2,807.50 due the Portersville Salaried Plan. Joint Appendix, Joint Exhibit 28 (p. 302).

28 (p. 302). Greene testified, at a deposition, that none of the quarterly installments required by the note were paid because there were no funds available. However, Greene further testified that he was not concerned because the loans were more than adequately covered by the collateral.[20] Greene deposition of October 26, 1981, p. 65.

Additionally, the Bollinger Salaried Plan made certain loans to Bollinger. On October 11, 1971, Greene transferred $11,233.63 from the Bollinger Salaried Plan investment account to that plan's checking account. Greene and Allen then immediately wrote a check for $11,000 to Bollinger and took back an unsecured, demand note. The note, signed by Greene and Allen, called for 9 percent interest per annum on the principal amount. Joint Appendix, Joint Exhibit 4 (pp. 439–447).

By 1973, Bollinger could not afford to make contributions to the Bollinger Salaried Plan. In January of 1973, Bollinger issued two checks, totalling $7,330.50, to the Bollinger Salaried Plan, and that plan simultaneously issued a check for $7,000 to Bollinger. Stipulation of Facts, ¶ 38. Greene called this a "wash transaction," which insured that the checks would cross at the bank and that neither would bounce. Greene further stated that this was, in essence, a loan transaction and that this loan transaction was preferable to a showing of "unpaid pension plan contributions on the books." Greene deposition of October 26, 1981, p. 106. In return for the loan, Greene and Allen signed a demand note, on behalf of Bollinger, which provided for 9 percent interest per annum. Joint Appendix, Joint Exhibit 43 (p. 459). It should be noted that

this $7,000 loan took place while the original $11,000 amount was still outstanding and with no payment having been made, on either principal or interest, since the original loan of October 11, 1971. Joint Appendix, Joint Exhibit 45 (pp. 466–481).

On November 8, 1973, Greene withdrew $8,700 more from the Bollinger Salaried Plan investment account and, on the same day, transferred that amount to Bollinger. In return for the loan, Greene and Allen signed an $8,700 demand note, which provided for 9 percent interest per annum. Joint Appendix, Joint Exhibit 42 (pp. 449–451).

In August of 1974, a second "wash transaction" took place. That is, at that time, Bollinger again could not afford to make contributions to the Bollinger Salaried Plan. Greene deposition of October 26, 1981, pp. 104–106. Therefore, Bollinger issued a check to the Bollinger Salaried Plan in the amount of $8,531.50, and the plan simultaneously issued a check back to Bollinger in the amount of $8,500 and took back an unsecured demand note, signed by Greene and Allen, for that amount. Stipulation of Facts, ¶ 38.

Bollinger was billed monthly for the interest due on the loans and that minimal payments were made.[21] However, as of the time of Bollinger's bankruptcy filing, in March of 1976, $35,288.99 remained outstanding, which figure includes the principal and balance of $27,850 and the interest balance of $7,438.99.[22] Joint Appendix, Joint Exhibit 45 (p. 519).

There were also loans made from the Bollinger Union Plan to Bollinger. Two of

---

**20.** It should be noted at this point that there is an indication that Superior was selling its accounts receivables, which served as collateral in the notes to the plans, to the National Acceptance Corporation on a regular basis from 1972 on. First Affidavit of Herbert S. Zveitel, ¶ 11 (docket No. 47).

**21.** Joint Appendix, Joint Exhibit 45 (pp. 466–523) reveals that no payments were made between October, 1971 and April 30, 1974, to either principal or interest. Small payments were made between May and August of 1974, and between September of 1974 and December

of 1974, Bollinger made payments of $150 per month. Finally, from December of 1974 until Bollinger's bankruptcy filing in March of 1976, Bollinger made monthly payments of $400. All payments were allocated directly to principal.

**22.** Bollinger was actually billed through July of 1976, and at that time owed $36,154.47 (Joint Appendix, Joint Exhibit 42 (p. 523)); however, plaintiff's brief makes claim only through the filing of bankruptcy, in March of 1976, for the amount set forth in the text. Accordingly, the Court uses that amount.

the loans were "wash transactions." First, in January of 1973, Bollinger made a $9,127 contribution to the plan and immediately took back a $9,000 loan. An unsecured demand note, providing for 9 percent interest, was signed by Greene and Allen in return for the loan. Joint Appendix, Joint Exhibit 47 (pp. 529–531). A second "wash transaction" occurred in February of 1974. In that transaction, Bollinger made an $8,832.80 contribution to the Bollinger Union Plan and took back a $8,600 loan. Again, Greene and Allen signed a demand note, which provided for 9 percent interest on the $8,600 amount. Joint Appendix, Joint Exhibit 48 (pp. 531–536).

Also, the Bollinger Union Plan loaned Bollinger $5,850 in November of 1973. In return, Bollinger gave an unsecured demand note back to the plan signed by Greene and Allen. As in all other cases, the note provided for 9 percent interest. Joint Appendix, Joint Exhibit 49 (pp. 537–542).

Between February of 1973 and July of 1976, Bollinger was sent monthly bills on these loans by the Bollinger Union Plan Trust. Various payments were made, with all payments applied to principal. By the time of Bollinger's bankruptcy in March of 1976, there remained outstanding $17,220.75, which figure represents $13,100 in principal and $4,120.75 in interest.[23] Joint Appendix, Joint Exhibit 50 (p. 581).

The Portersville Salaried Plan also made loans to Bollinger. In October and November of 1973, the Portersville Salaried Plan made two loans to Bollinger, totalling $3,750.[24] Once again, Bollinger gave back two unsecured demand notes, at 9 percent interest, signed by Greene and Allen, in exchange for the loans. Joint Appendix, Joint Exhibit 39 (pp. 393–403). As of March, 1976,[25] there remained $4,012.62 outstanding. Joint Appendix, Joint Exhibit 40 (p. 433).

Finally, the Portersville Union Plan made loans to Kincaid. Between June of 1972 and September of 1972, the Portersville Union Plan loaned Kincaid $26,806.97. Joint Appendix, Joint Exhibit 37 (p. 382). Another loan was made, in January, 1973, for $3,193.03, and still another occurred in October of 1974, for $2,900. Joint Appendix, Joint Exhibit 37 (pp. 386–387). These loans total $32,900.

The plaintiff's brief acknowledges that $2,100 was paid on these loans, with that entire payment going toward principal. This left a principal balance due of $30,800. The only evidence of interest due on this amount is a bill from the Portersville Union Plan Trust to Kincaid, indicating that $5,283 interest was due. Joint Appendix, Joint Exhibit 38 (p. 391). The total principal and interest outstanding is $36,083.

 The Court notes, at this point, that the total claimed outstanding on these loans is $170,780.36. It is now appropriate to review the applicable Pennsylvania law that governs these transactions.

In Pennsylvania:

Every fiduciary is obligated, in managing the investment of trust assets, to exercise the care, skill, and judgment of an ordinarily prudent person unless it either has or procures its appointment by representing that it has greater skill, in which case it is obligated to exercise such greater skill.

*Estate of Stetson,* 463 Pa. 64, 74–75 n. 4, 345 A.2d 679, 685 n. 4 (1975). *See In re Estate of Killey,* 457 Pa. 474, 477, 326 A.2d 372, 375 (1974). This "prudent man rule" is statutory law in Pennsylvania. Title 20 Pa.C.S.A. § 7302(b) provides in pertinent part as follows:

Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment

---

**23.** Again the Court notes that Bollinger was actually billed through July of 1976, and at that time owed $17,613.75. Joint Appendix, Joint Exhibit 50 (p. 585). Again, however, plaintiff's brief claims only the amount through March of 1976.

**24.** The loan of October of 1973 was for $3,000, while the November, 1973, loan was for $750. Joint Appendix, Joint Exhibit 39 (pp. 393, 399).

**25.** Once again, plaintiff's claim is only through March of 1976.

and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent distribution of their funds, considering the probable outcome to be derived therefrom as well as the probable safety of their capital.

This rule has been the law of Pennsylvania for some time (*In re Gillingham's Estate,* 353 Pa. 493, 46 A.2d 269 (1946); *In re Greenawalt's Estate,* 48 Dauph. 222, aff'd. 343 Pa. 413, 21 A.2d 890 (1940); *In re Brown's Estate,* 287 Pa. 499, 135 A. 112 (1926)) and is intended to prevent transactions which offer a high potential for loss of plan assets and insider abuse. *See In re Noonan's Estate,* 361 Pa. 26, 30–31, 63 A.2d 80, 83 (1949). The fact that a prohibited investment or loan is or may be ultimately repaid does not render the loan lawful; its propriety must be judged at the time that the loan (investment) was made. *In re Saeger's Estate,* 340 Pa. 73, 75–76, 16 A.2d 19, 21 (1940).

 The plaintiff, who seeks to surcharge the trustee in this case, bears the burden of proving that the trustee breached an applicable fiduciary duty. *Estate of Stetson, supra,* 463 Pa. at 84, 345 A.2d at 690. Further, the plaintiff must establish that there is a causal connection between the breach of duty and the loss. *Id.* at 83, 345 A.2d at 690. However, once a beneficiary [26] has succeeded in proving a breach of duty and a loss flowing therefrom, the burden shifts to the charged trustee to establish that the loss would have occurred in the absence of a breach of duty. *Id.* at 84, 345 A.2d at 690. The Court emphasizes that as between an innocent beneficiary and a defaulting fiduciary (trustee), the fiduciary must bear the risk of uncertainty as a consequence of his breach of duty. *Id.*

 In this case, it is clear to the Court that defendants Greene and Allen breached their fiduciary duties as trustees. Remem-

bering that a fiduciary is bound by the prudent man rule, the Court does not believe that a prudent man would invest all of his money in one type of investment, especially when companies in which the money was invested were having financial, and other types of, problems. *See* Stipulation of Facts, ¶¶ 8 and 28. In essence, the Court does not believe that it is prudent to put "all of the eggs in one basket" because if that basket breaks, the eggs break with it. Rather, the Court believes that the prudent thing to do is to diversify investments so that the solvency of the trust fund is not dependent upon one investment or type of investment.

The trustees' failure to diversify investments in this case proved to be especially detrimental. They continued to pour money into these companies. This was done to the point that the trust funds were almost completely dissipated. As of mid-1976, the Portersville Union Plan had only $89.49 in cash in its trust fund (Joint Appendix, Joint Exhibit 21 (p. 211a)); the Portersville Salaried Plan had only $15.77 in its trust fund (Affidavit of Michael Madron, Exhibit 1 (docket entry 46)); and the Bollinger Salaried Plan had no cash (Joint Appendix, Joint Exhibit 25 (p. 226)). These plans did hold notes receivable for the amounts outstanding, but the notes were received from companies that could not pay them. Moreover, all but one of the notes were unsecured. The Bollinger Union Plan did hold United States Treasury notes worth $17,-000, but it also held notes receivable in excess of $18,000 from companies that could not pay them. Joint Appendix, Joint Exhibit 26 (p. 231). In sum, the plaintiff's brief correctly states that the trust funds were "ravaged." ·

 The problem is compounded in this case by the fact that the trustees, Greene and Allen, also had a vested interest in the companies to which the loans were made. As Stipulation of Facts, ¶¶ 3, 4, and 5 state, at all relevant times, Greene and

---

**26.** The PBGC normally becomes statutory trustee when a plan does not have sufficient assets to satisfy the benefits guaranteed by Title IV. 29 U.S.C. §§ 1341–1342. In this case, it brings the action on behalf of the beneficiaries.

Allen were directors, officers, or shareholders of Kincaid, Bollinger, and Portersville (the companies to which the loans were made), and Superior (another company to which a loan was made) was a wholly-owned subsidiary of Kincaid. Under Pennsylvania law, these loans amount to self-dealing by a fiduciary, which is forbidden. As the Pennsylvania Supreme Court has stated:

> A fiduciary entrusted with the interests of others cannot be allowed to make the business an object of interest to himself because from the frailty of nature, one who has the power, will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of others for whom he is entrusted.

*In re Noonan's Estate, supra,* 361 Pa. at 31, 63 A.2d at 83. The test for forbidden self-dealing is "whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in a material connection," and "the extent of a fiduciary's disqualifying interest for self-dealing is not 'did his interest affect his judgment,' but rather 'might his interest affect his judgment.'" *Id.* These tests are clearly met in this case in that the trustees had a substantial personal interest in the companies to which the loans were made that might have affected their judgment. The position of the trustees put them in the best position to recognize the volatile financial condition of the companies to which they were making loans; nevertheless, they made the loans in spite of this knowledge. It is apparent to the Court that the trustees were concerned with their own financial interests first, and the financial condition of the plans was of secondary concern. In other words, the trustees served their own interest at the expense of others for whom they were entrusted. Thus, the trustees not only violated the prudent man rule, but also the forbidden self-dealing rule.

 It may be argued that Greene was the primary violator here because he, alone, consistently signed the withdrawal and deposit slips. *See, e.g.,* Joint Appendix, Joint Exhibits 41, 42, 43 (pp. 442, 449, and 456). However, when a co-trustee "hears of any fact tending to call his attention to the mismanagement or misapplication of trust funds by his co-trustee it is his duty to intervene ... failure to do so would be a breach of trust imposing liability upon him for the loss." *Adams Estate,* 221 Pa. 77, 81, 70 A. 436 (1908). *See also Herr v. United States Casualty Co.,* 347 Pa. 148, 150, 31 A.2d 533, 534 (1943). In light of the fact that Allen signed a check for a large amount from a plan to Bollinger (see Joint Appendix, Joint Exhibit 41 (p. 439)) and signed all unsecured demand notes for the loans, he should have at least been on notice of the improper investments, and his failure to intervene puts him on the same plateau with Greene.

The defendants do not deny these loans; rather, they argue that the loans were prudent under the circumstances. As their brief states:

> Although subsequent events have proven that these investments were not profitable, the trustees had no reason to suspect this at the time of the loans. *The corporations were run by the Defendants* and the Defendants believed the corporations would eventually be successful. They went so far as to invest their own personal funds in the corporations. In light of subsequent events, it is easy for Plaintiff to argue with hind-sight that the loans were unwise investments, but at the time they were made, these transactions were intended to benefit the Plans because absent such transactions the Plans may well have failed prior to the inception of the Pension Benefit Guaranty Corporation ... and the employees would have been denied of any insurance on their own funds whatsoever.

Defendants' Brief in Response to Motion for Summary Judgment, p. 7 (emphasis added).

This argument holds no weight with the Court. Whether one looks at the transactions in foresight or hindsight, they are illegal because they violate the prudent

man and forbidden self-dealing rules. Moreover, the Court does not believe that these transactions were intended to protect the plans; rather, they were intended to advance the trustees' own personal interest.

In sum, in connection with the loan transactions, the Court is satisfied that there was a breach of fiduciary duty by both Greene and Allen. This breach was the direct cause of loss on the part of the plans, and the defendants have not established that the loss would have occurred in the absence of the breach of duty. Accordingly, the trustees may be surcharged for these losses.

### 2. The Contributions

The plans also had a large amount of outstanding contributions at the time that the PBGC took over as statutory trustee. It should be noted at this point that the Court is cognizant of the fact that certain of these contributions came due after the effective date of ERISA; thus, this discussion may also include post-ERISA failures to make such contributions. Nevertheless, the Court believes that Greene and Allen have breached their fiduciary obligations in connection with these contributions both under state law and under ERISA. Therefore, a distinction between the two is merely a matter of academics. The Court will, however, discuss the contributions in the ERISA section of this Opinion to clarify its position on this issue.

Initially, the Court addresses the contributions due the Bollinger Salaried Plan. The Bollinger Salaried Plan required participants/employees to contribute 4 percent of their monthly compensation to the plan. Joint Appendix, Joint Exhibit 2 (p. 26). Between 1953 and 1976, Bollinger deducted the appropriate amount from the employ-

ees' pay checks, but, beginning in 1973, Bollinger did not forward all of these amounts to the trust fund. Stipulation of Facts, ¶ 46. As of the time of Bollinger's bankruptcy in March of 1976, Bollinger owed employee contributions of $14,269.18.[27] Joint Appendix, Joint Exhibit 45 (p. 519).

The Bollinger Salaried Plan also required the employer (Bollinger) to make contributions to the trust fund. Joint Appendix, Joint Exhibit 2 (p. 26). After August, 1974, Bollinger made no contributions, or issued notes in lieu of contributions, to the trust fund. Stipulation of Facts, ¶ 40. As of March, 1976, Bollinger owed $14,391.45[28] as its share of the contributions. Joint Appendix, Joint Exhibit 46 (pp. 526–527).

Further, Bollinger was required to make contributions to the Bollinger Union Plan pension fund. Joint Appendix, Joint Exhibit 1 (p. 11). After February, 1974, Bollinger did not make the contributions to the plan as required. Stipulation of Facts, ¶ 44. At the time of its bankruptcy filing, Bollinger owed this fund $26,864. Joint Appendix, Joint Exhibit 50 (pp. 578–585).

Plaintiff also claims contributions due the Portersville Union Plan. The plan required that Portersville make contributions to the trust fund. Joint Appendix, Joint Exhibit 3 (p. 52). Portersville did not make such contribution for the plan years 1974, 1975, and 1976. Stipulation of Facts, ¶ 45. There is a total contribution due, for the years 1974 and 1975, of $16,642.84. Joint Appendix, Joint Exhibit 52 (p. 601). There is no evidence of the amount due for 1976.

The outstanding contributions total $72,167.47.[29] The defendants do not deny that the contributions were not paid and remain outstanding; rather, they raise the follow-

---

**27.** The Court notes that none of plaintiff's claims on past-due contributions include interest.

**28.** Plaintiff also claims $6,900.27 for the year ending December 18, 1973; however, the Stipulation of Facts indicates that no amounts were paid *after* August of 1974. This amount was due *in* August of 1974, and plaintiff does not cite the Court to any material that indicates that it was not paid; the only cite given is to a

bill for this amount. Joint Appendix, Joint Exhibit 46 (p. 525). Since there is no proof that this amount was not paid, the Court does not award it.

**29.** It should be noted that Stipulation of Facts ¶ 45 indicates that Portersville failed to make contributions for the plan years 1972, 1975, and 1976, but plaintiff makes no claim for these contributions.

ing legal argument to prevent liability on their part. The defendants point to several of the trust agreements which provide that the trustees shall not have the right and shall not be subject to any duty to demand or collect from the company any sums of money. *See* Joint Appendix, Joint Exhibits 12 (pp. 131–132) and 13 (pp. 157–158). Based on these provisions, the defendants assert that the companies were contractually obligated to make the contributions, but the trustees had no obligation to enforce those contractual obligations. Specifically, the defendants assert that, in light of the provisions which limited their right, and imposed no duty on them, to collect the delinquent contributions, they would have had no standing to bring an action to collect the delinquent amounts. Moreover, the defendants contend that the companies were not in a financial position to make such payments and, therefore, the defendants acted prudently by not attempting to collect the debts. The defendants claim that they fulfilled their fiduciary obligations by billing for these amounts. In essence, the defendants contend that they cannot be held personally liable for failure to enforce the companies' contractual obligations.

These arguments are not convincing to the Court. The Court acknowledges that certain provisions in the trust agreements did not require the trustees to collect debts from the companies, but the Court does not turn its decision on that basis. Rather, the Court relies upon the forbidden self-dealing rule already discussed in this Opinion. Under that rule, a fiduciary is forbidden to make the business an object of interest to himself. *In re Noonan's Estate, supra,* 361 Pa. at 31, 63 A.2d at 83. As stated, the test for forbidden self-dealing is "whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in a material connection," and "the extent of a fiduciary's disqualifying interest for self-dealing is not 'did his interest affect his judgment,' but rather 'might his interest affect his judgment.'" *Id.*

Here, at the same time that Greene and Allen served as trustees of the Bollinger Union and Salaried Plans, Greene served as Vice-President and Chairman of the Board of Bollinger and Allen served as President and a member of the Board of Directors of Bollinger. Defendants' Answer to First Interrogatories, ¶ 1(e) and (f) (docket entry 33); Allen deposition of October 27, 1981, p. 56. Moreover, at the same time that Greene and Allen served as trustees of the Portersville Union Plan, Greene was Chairman of the Board and Vice-President of Portersville and Allen served as President of Portersville. Defendants' Answer to First Interrogatories, ¶ 2f (docket entry 33); Allen deposition of October 27, 1981, p. 31.

This means that the trustees were controlling both the trust accounts and the companies which owed contributions to those accounts. Paragraphs 26 and 27 of the Stipulation of Facts reveal that after 1971, Greene retained possession of all checkbooks, passbooks, and other documents of all trust accounts. Thus, Greene and/or Allen were the only ones in position to know that the contributions were not being made. It is apparent to the Court that Greene and Allen had personal interests in these contributions which might have affected their judgment in connection with the failure of the companies to make these contributions. In essence, the trustees permitted their personal needs and desires to affect a decision in connection with the plans. Under these circumstances, Greene and Allen cannot hide behind the agreement language which provided that they had no right or obligation to collect debts. Their connection with these contributions goes much deeper than the failure to collect delinquent contributions; it (the connection) goes to the failure to make the contributions in the first instance and to the permitting of the delinquencies to go unnoticed for such a long period.

This Opinion has already discussed the fact that certain "wash transactions" occurred in order to make the records show loan transactions, rather than delinquent contributions. Greene and Allen both took

part in these transactions for the purpose of "hiding" some of the delinquent contributions on the books.

Again, the argument may be made that Greene was prime motivator in the failure to pay contributions, and should be exclusively liable, but again the Court rejects this argument. The Court again notes that a co-trustee has a duty to intervene when any fact calls his attention to the mismanagement of trust funds by a co-trustee. Failure to intervene at that point results in a breach of trust, which imposes liability upon the trustee. *Adams Estate, supra,* 221 Pa. at 81, 70 A. 436. Allen's own deposition reveals that he was aware of the "wash transactions." Allen deposition of October 27, 1981, p. 55. More importantly, Allen knew that the companies were not meeting their financial obligations and, specifically, that contributions were being withheld from the employees, but not paid to the funds. Allen deposition of October 27, 1981, pp. 57, 72, and 101. In fact, Allen was not concerned because "this was . . . all going to be caught up at some point in time." Allen deposition of October 27, 1981, p. 101.

It must be remembered that a plaintiff who seeks to surcharge a trustee must prove that the trustee breached an applicable fiduciary duty and that there is a causal connection between the breach of duty and the loss. *Estate of Stetson, supra,* 463 Pa. at 83, 345 A.2d at 690. The Court finds that plaintiff has met its burden here by establishing that defendants breached their fiduciary obligation in connection with the contributions and that there is a causal connection between this breach of duty and the loss. Accordingly, the Court imposes liability upon the defendants for the amount of the outstanding contributions, $72,167.47.

### B. Post-ERISA Claims

Plaintiff also asserts claims under ERISA. ERISA took effect on January 1, 1975. 29 U.S.C. § 1114. Under 29 U.S.C. § 1114(b)(2), it was possible to postpone the effective date of ERISA, in connection with § 1102 (Establishment of plan); § 1103 (Establishment of trust); § 1105 (Liability for breach of co-fiduciary); and § 1110 (Exculpatory provisions; insurance), until no later than January 1, 1976. The four plans applied for, and received, postponements until June 30, 1975. Joint Appendix, Joint Exhibit 16 (pp. 183–194). Thus, all provisions of ERISA applied in this case as of June 30, 1975, at the very latest, while the majority of the provisions, such as 29 U.S.C. § 1104 (Fiduciary duties), became effective as of January 1, 1975.

There is one issue that needs to be addressed before commencing with a discussion of plaintiff's substantive claims under ERISA. The plaintiff's brief raises the issue of Greene's and Allen's attempt to resign as trustees before the effective date of ERISA. All of the trust agreements required written notice to the Company or Employer for effective resignation of the trustees. Joint Appendix, Joint Exhibit 2 (p. 27); Joint Exhibit 12 (p. 153); and Joint Exhibit 13 (p. 167). The trustees, Greene and Allen, did tender resignation letters, but these letters were addressed to the trustees of the various plans. Joint Appendix, Joint Exhibits 14 and 15 (pp. 173–181). In effect, the trustees notified themselves that they were resigning. These letters did not comply with the resignation requirements. Moreover, the trustees did not notify the institutions which handled the various trust accounts. Greene deposition of October 26, 1981, pp. 94–95; Allen deposition of October 27, 1981, p. 27. Moreover, no new trustees were appointed (Stipulation of Facts, ¶ 15), and, most importantly, Greene continued to perform the functions of trustee and retained possession of all checkbooks, passbooks, and other documents up until the time that the PBGC became statutory trustees. Stipulation of Facts, ¶ 17 and ¶ 27. Under ERISA, a trustee must be held to have continued in a fiduciary status absent a clear resignation, and a resignation is valid only when he has made adequate provision for continued prudent management of the plan assets. *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 635 (W.D.Wis.

1979). Applying this law to the facts of this case, the Court finds that the trustees neither tendered a valid resignation nor made adequate provision for continued prudent management of the plan assets. Accordingly, the Court finds that Greene and Allen remained as trustees and fiduciaries after the effective date of ERISA.

### 1. The Loans and Contributions

Plaintiff asserts that the pre-ERISA violations give rise to ERISA liability for failure to take corrective steps after the effective date of ERISA. Specifically, plaintiff asserts that defendants had an obligation to take corrective steps in connection with the pre-ERISA loan transactions, preferably by attempting to collect the same. Further, plaintiff contends that the defendants/trustees should have attempted to collect delinquent contributions, or, at the very least, take some corrective measures with regard to the delinquent contributions, and to insure the payment of those contributions due after the effective date of ERISA.

■■■ The Second Circuit opinion in *Morrissey v. Curran*, 567 F.2d 546 (2 Cir.1977), addressed a situation in which pre-ERISA breaches of trust continued after the effective date of ERISA.[30] The Second Circuit held that ERISA trustees cannot be excused from a fiduciary obligation merely because an unwise investment was made before ERISA took effect. In concurring in *Morrissey*, Judge Lumbard stated:

Just as trustees who retained their posts through the magic date of January 1, 1975, may be said to have started with a clean slate (in the eyes of federal law) with respect to the quality of the plan's investments, so they started with a clean slate with respect to abuses that they may have deliberately ignored or aided in concealing—but in either case, the slate would rapidly be soiled if the trustees did not take advantage of the locus poeniten-

tiae afforded them by the statute, and swiftly act to remedy their and their cotrustees' past delicts.

*Id.* at 550. As a basis for this statement and as an example of steps that could be taken to clear up the pre-ERISA problems, Judge Lumbard cited the following legislative history:

[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.

*Id.*, quoting House Conference Report No. 93–1280, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News 4639, 5080. Accordingly, the Court finds that a pre-ERISA breach of duty can give rise to ERISA liability if proper corrective measures are not taken.

In enacting ERISA, Congress intended to federalize the common law of trusts. *Freund, supra,* 485 F.Supp. at 635. *See* 93d Cong., 2d Sess., U.S.Code Cong. & Ad.News, pp. 4639, 5186 (remarks of Senator Harrison Williams).[31] In essence, ERISA seeks to establish uniform fiduciary standards. *Freund, supra,* at 635. ERISA codifies the "prudent man rule" at 29 U.S.C. § 1104(a)(1)(B), which requires that a fiduciary discharge his duties:

with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Moreover, ERISA requires a fiduciary to diversify investments in order to minimize the risk of large losses. 29 U.S.C. § 1104(a)(1)(C). These provisions indicate that the defendants were bound by essentially the same requirements after the effective date of ERISA as they were before said date.

---

**30.** The Court is cognizant of the fact that *Morrissey* dealt primarily with a jurisdictional question; however, the Court finds that many of the principles espoused in *Morrissey* apply in this case.

**31.** Senator Williams stated that the objective of ERISA's fiduciary provision is "to make applicable the law of trusts."

The defendants argue that they acted prudently after the effective date of ERISA, by not attempting to collect the delinquent loans and the delinquent contributions because it was obvious, at that time, that the companies could not pay these debts, and it would have been imprudent to attempt to collect such debts from entities which could not pay them.[32] Moreover, the defendants again assert that they had no obligations, under the trust agreements, to collect delinquent contributions. The Court does not accept this reasoning.

First, the Court addresses the continuing violation in connection with the pre-ERISA loan transactions. This Court has previously held that pre-ERISA acts may result in post-ERISA liability on the basis of a continuing duty to review and liquidate improvident assets. *Trustees of the Retirement Benefit Plan v. Equibank,* 487 F.Supp. 58, 62 (W.D.Pa.), *appeal dismissed,* 639 F.2d 772 (3d Cir.1980). That is, many pre-ERISA investment decisions can result in ERISA liability if there is a failure to continue to oversee improvident investments. Here, the defendants billed the companies for the loans, but took no action to collect them or to insure their payment. At the very least, the defendants could have taken steps to, in some way, secure the unsecured demand notes, or, in the alternative, to obtain judgment notes. It must be emphasized that the defendants continued to allow the non-diversification of investments. This conduct amounts to a breach of the ERISA fiduciary requirements, and the Court is satisfied that there is a causal connection between the breach and the loss.

Second, the Court addresses the failure of the companies to make contributions. As stated, the defendants assert that the trust agreements imposed no obligation to collect such debts. Even conceding this point, the Court finds that defendants violated their ERISA fiduciary duties in connection with these contributions. In *Rosen v. Hotel and Restaurant Employees & Bartenders Union,* 637 F.2d 592 (3d Cir.1981), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981), an action by an employee against the union, union pension fund, and plan trustees for pension benefits, the Third Circuit addressed the obligation of a trustee, under ERISA, in connection with delinquent contributions. The Court stated that "[a]t a minimum, the fiduciary obligations of a pension fund trustee require that he notify the pensioner of his employer's failure to contribute to the fund as required by the pension agreement." *Id.* 637 F.2d at 600. The parties have not drawn the Court's attention to any place in the record which indicates that the trustees notified the pensioners of the delinquent contributions; therefore, the Court assumes that no such notification was given.[33] In fact, rather than inform the pensioners of the delinquencies, Greene attempted to relieve the companies of paying part of the contributions. *See, e.g.,* Joint Appendix, Joint Exhibit 51 (pp. 587–588). On this basis, the Court finds another breach of fiduciary duty under ERISA, and, again, the Court is satisfied that there is a causal connection between the breach and the loss.

At this point, the Court emphasizes that it adds no new amounts to the figures already established in the preceding section of this Opinion, since those figures represent both pre-ERISA and post-ERISA losses up to the time of the bankruptcy filings of Bollinger and Portersville. However, this discussion of the delinquent loans and contributions serves to point out that the breaches continued after the effective date of ERISA and that it was proper to

**32.** The Court views this as a "Catch 22" argument. On the pre-ERISA breach issues, the defendants argued that it was prudent to invest in the companies because there were indications, at that time, that they would eventually become profitable. Now, the defendants argue that it would have been imprudent to attempt to collect the debts post-ERISA because the companies were not profitable. The Court cannot accept this logic.

**33.** Notification was especially important in this case because the trustees also controlled the companies which failed to make the contributions. In the absence of such notification here, there was virtually no way of the pensioners finding out that information.

include in the loss amounts figures from the post-ERISA period. The Court notes, in concluding this section, that both Greene and Allen are liable for these breaches under ERISA for the same reasons set forth in the preceding section on pre-ERISA violations.

### 2. Lease and Auction

On February 17, 1975,[34] the Bollinger Salaried Trust, the Portersville Salaried Trust, and the Portersville Union Trust entered into a lease agreement with Economy, a partnership comprised of Greene and Allen. Joint Appendix, Joint Exhibit 32 (pp. 350–352); Stipulation of Facts, ¶ 3 and ¶ 4. The circumstances surrounding that lease follow. In 1975, Superior sold its land and building to Economy. Affidavit of Herbert Zveitel, ¶ 7. Around the same time, Economy and Superior entered into a lease agreement in connection with the same land and building, with Economy as the lessor and Superior as the lessee; in other words, Superior sold its property to Economy and then leased it back. By February of 1976, Superior was in default under the lease, in that it owed $171,325 in rent. Joint Appendix, Joint Exhibit 32 (p. 350).

In February of 1976, Greene and Allen permitted three of the plans to enter into a lease agreement with Economy that also included Superior. The agreement acknowledged that the plans previously loaned money to Superior ($40,994.76) and that the loan was secured under a security agreement covering Superior's chattels, inventory, and accounts receivable. The essence of this agreement was that the plans took title to all of Superior's physical assets, located on the land and building, for the purpose of selling these assets to satisfy Superior's debts to the plans, and, in addition, that Economy leased the land and building to the plans for the purpose of storing the property until the sale took place. Greene signed on behalf of all of the plans and Greene and Allen signed on behalf of Economy. Joint Appendix, Joint Exhibit 32 (pp. 351–352). Plaintiff seeks a judgment, against Greene, Allen, and Economy for the rent paid ($3,053.98—Joint Appendix, Joint Exhibit 32 (p. 362)) to Economy under this lease.

Plaintiff claims that defendants violated their fiduciary obligation under ERISA by permitting the plan to enter into such a lease arrangement. Plaintiff points specifically to 29 U.S.C. § 1106(a), which prohibits a fiduciary from causing a plan to engage in a lease of property between a plan and a party in interest. Plaintiff asserts that since the parties to this agreement are parties in interest (Stipulation of Facts, ¶ 12), the lease agreement was not proper under § 1106(a). Accordingly, plaintiff asserts that Greene, Allen, and Economy are liable for the rents paid.

Defendants acknowledge the presence of § 1106(a), but cite the Court to 29 U.S.C. § 1108(b)(2), which provides an exception to § 1106(a). Section 1108(b)(2) provides, in pertinent part, as follows:

(b) The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions

\*　　\*　　\*　　\*　　\*　　\*

(2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, . . . .

The Court could locate only one circuit case that discussed the interplay between § 1106(a) and § 1108(b)(2). In *Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir. 1978), the Second Circuit stated:

[T]he fiduciary remains a "party in interest" and subject to the substantive requirements of Section 1106; . . . § 1108(b)(2) simply make[s] it possible to justify transactions which would otherwise be unequivocally prohibited transactions by demonstrating their fairness and reasonableness.

---

**34.** The Court notes that by this date, all of the provisions of ERISA were in full force and effect in connection with all of the plans.

The Court finds that defendants did not so justify the lease transaction in this case. To the contrary, the Court views this transaction as another attempt to transfer money from the plans to the financially ailing businesses. In essence, the trustees were attempting to further their own financial interests, and the interests of their partnership, at the expense of the plans. This transaction was unequivocally prohibited, and the fiduciaries violated their obligations under ERISA by permitting the plans to engage in it. Accordingly, all defendants are liable for the $3,053.98 in rent paid.

### 3. The missing Treasury Notes

At the time of its termination, the Bollinger Union Plan owned United States Treasury Notes, which were held by Dean Witter Reynolds, Inc. (hereinafter referred to as "Reynolds"). Joint Appendix, Joint Exhibit 26 (p. 231). In August of 1978, February of 1979, and August of 1979, Reynolds issued checks, for interest on the Notes, in the amount of $680 each. All three checks were payable to the Bollinger Union Plan. Joint Appendix, Joint Exhibits 57–61 (pp. 612–632). Greene endorsed and cashed the checks of August, 1978 and February, 1979, and the August, 1979, check was deposited in Greene's wife's savings account. The PBGC was statutory trustee at the time that these checks were issued, but the money was never paid to the PBGC. Stipulation of Facts, ¶¶ 48–50. The defendants make no response to this allegation, and the Court holds that the record is clearly sufficient to hold Greene liable for the total amount of these checks, $2,040.

### C. The Counterclaims

As stated in an earlier section, the defendants raise two counterclaims in this action, namely a claim for rent due under the lease agreement between several of the plans and Economy and a claim for a penalty of $100 per day for every day that the PBGC failed to provide information in con-

nection with the various funds and the pensioners options and eligibility in connection with the same. The Court addresses each counterclaim separately below.

### 1. The Rental Claim

Defendant Economy claims rental payments due from the Bollinger Salaried Trust, the Portersville Salaried Trust, and the Portersville Union Trust under their lease agreement with Economy. Joint Appendix, Joint Exhibit 32 (pp. 350–352). The Court has already determined that this lease was improper under 29 U.S.C. § 1106(a); therefore, defendant Economy's rental claim in connection with that lease is meritless.

### 2. Failure to Provide Information

Defendants Greene and Allen[35] claim a penalty of $100 from the day that the PBGC failed to provide, upon written request of Greene, a statement of vested and accrued benefits for the Bollinger Salaried Plan participants pursuant to 29 U.S.C. § 1025 and § 1132(c). Answer to Amended Complaint, p. 6. This claim is meritless in light of the previous decision of this Court in *Crawford v. Armour and Company Salaried Employees Pension Plan,* C.A. 82–1191 (W.D.Pa. Opinion and Order of November 3, 1982).

In that case, the pension plan moved to dismiss a claim against it for failure to provide information under 29 U.S.C. § 1025 and § 1132(c). The Court stated that 29 U.S.C. § 1132(a)(1)(A) provides that a civil action may be brought by a participant or beneficiary for the relief provided in § 1132(c), which states that an administrator may be liable to any participant or beneficiary, in an amount of up to $100 per day, from the date of a failure or refusal to provide information. Title 29 U.S.C. §§ 1021–1031 set forth reporting and disclosure requirements under ERISA. These sections impose upon the plan administrator the obligation of reporting on plan descrip-

**35.** It should be noted that Greene and Allen make this claim as participants in the Bollinger Salaried Plan.

tions, modifications, and changes, as well as reports to be filed with the Secretary of Labor. Specifically, the administrator is required to publish, for each participant or beneficiary, a description of the plan and a summary of the annual financial report. H.R. No. 93–533, 93d Cong., reprinted in [1974] U.S.Code Cong. & Ad.News 4639, 4656. This reporting and furnishing of information helps the participant or beneficiary make an informed decision concerning benefits.

After making these determinations in *Crawford,* the Court turned to the ERISA definition of administrator. Under 29 U.S.C. § 1002(16)(A)(i) and (ii), an administrator as "the person specifically . . . designated by the terms of the instrument . . ." or "if an administrator is not . . . designated, the plan sponsor . . . ." Since the instrument in *Crawford* designated a party other than the pension plan as administrator of the plan, the Court dismissed the claim against the pension plan for failure to provide information because the providing of information is within the exclusive province of the administrator.

■ The rationale in *Crawford* is applicable to this case. The Bollinger Salaried Plan instrument did not name a plan administrator. Joint Appendix, Joint Exhibit 2. Section 1002(16)(A)(i) and (ii) provides that when an administrator is not named in the instrument, the plan sponsor, in this case Bollinger, is the plan administrator for purposes of ERISA. Accordingly, Greene

should have directed his request to Bollinger, who had the obligation to provide the information. The PBGC has no obligation and incurs no liability under this counterclaim.

### D. Prejudgment Interest

In the final section of this Opinion, the Court addresses plaintiff's claim for prejudgment interest. The key case for a discussion of prejudgment interest is *Nedd v. United Mine Workers of America,* 488 F.Supp. 1208 (M.D.Pa.1980).[36] The *Nedd* court addressed the awarding of prejudgment interest under both Pennsylvania and federal law.

As to the claim under Pennsylvania law, the *Nedd* court cited 20 Pa.C.S.A. § 3544, which vests the Court with discretion to hold a personal representative (such as an executor or trustee) liable for prejudgment interest. *Nedd, supra,* at 1215 n. 4. The Court proceeded to cite several Pennsylvania cases which have held that prejudgment interest is not granted as a matter of right, but may be granted by a court of equity[37] if circumstances dictate.[38] *Id.* at 1213–1216.

The *Nedd* court also held that "[a]lthough there is no general controlling congressional directive,[39] federal decisional law has long regarded prejudgment interest as a component of damages."[40] *Id.* at 1216. After canvassing numerous federal cases, the Court determined that prejudgment interest, under federal law, may be awarded in

---

**36.** The Court acknowledges that *Nedd* is not an ERISA action, but it does involve a breach of trust, and the Court believes that the discussion of prejudgment interest is applicable here.

**37.** A court in an ERISA action sits as a court of equity. *See Calamia v. Spivey,* 632 F.2d 1235 (5th Cir.1980); *Wardle v. Central States Southeast and Southwest Areas Pension Fund,* 627 F.2d 820 (7th Cir.1980).

**38.** The Pennsylvania Superior Court has held that a trustee is chargeable with interest where he makes improper investments. *In re Jones' Estate,* 163 Pa.Super. 129, 131, 60 A.2d 366, 367 (1948).

**39.** It should be noted that there is a federal statute governing postjudgment interest (28 U.S.C. § 1961), but it is silent as to prejudgment interest, and its silence does not preclude an award of prejudgment interest. *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988, 989 (6th Cir.1982); *In re Air Crash Disaster Near Chicago, Illinois,* 480 F.Supp. 1280, 1282 (N.D.Ill.1979), *aff'd,* 644 F.2d 633 (7th Cir. 1981).

**40.** As a basis for this assertion, the Court cited the 1872 United States Supreme Court case of *Young v. Godbe,* 82 U.S. (15 Wall.) 562, 21 L.Ed. 250 (1872).

the discretion of the Court if circumstances so dictate.[41] *Id.* at 1216–1219.

Having determined that the basis for awarding prejudgment interest is the same under both Pennsylvania and federal law, the Court developed four basic factors that a court may weigh in exercising its discretion on the issue of prejudgment interest. The four basic factors derived from the Pennsylvania and federal cases and reviewed by the court in *Nedd* are as follows: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against a surcharge.[42] *Id.* at 1219. The Court deems it appropriate and necessary to apply these factors to the case at hand.

First, the Court does not believe that plaintiff delayed in prosecuting this action. The Court is cognizant that the first breaches of fiduciary duties occurred as early as 1971; however, as stated several times in this Opinion, the breaches remained hidden due to the fact that the trustees also controlled the companies and all passbooks, checkbooks and other documents in connection with the trust funds. Plaintiff did not have an opportunity or cause to review all of the records until it became statutory trustee in 1976. After that time, the Court is aware of the fact that it probably took some time to sort the materials out and uncover the problems. Accordingly, the Court concludes that the nine-year lapse of time between the first breach of duty and the institution of this action cannot be attributed to delay tactics or want of diligence.

Second, the *Nedd* court emphasized that the "undoing" of unjust enrichment is a basic purpose of prejudgment interest, and the Court stated that unjust enrichment occurs when a "defendant has had the free use of the income-producing ability of plaintiffs' money without having to pay for it. . . ." *Id.* at 1220 (quoting Recent Developments-Prejudgment Interest of Damages: New Application of an Old Theory, 15 Stan.L.Rev. 107, 109 (1962)). The *Nedd* court suggested that the "use-value" of the money, alone, may be sufficient for the granting of unjust enrichment. *Id.* In this action, the vast majority of the money was never repaid. Those small sums that were repaid were applied directly to principal, even though interest on the principal amount was due and owing. The Court is cognizant of the fact that the companies, and not the trustees, used the funds; however, the defendants/trustees indirectly benefitted in that they were the main officers of the companies that remained afloat as a result of this money. In the case of Economy, it directly benefitted from the use of the improper rental payments. Therefore, the Court is satisfied that all defendants were unjustly enriched by the "use-value" of the money.

Next, the Court considers whether an award of prejudgment interest would be compensatory. This consideration is based on the belief that "the inherent income-producing ability of money cannot be separated from the money itself . . . ." *Nedd, supra,* at 1221 (quoting *Recent Developments, supra,* at 109). In this case, the Court strongly believes that if the trust funds had had the benefit of these funds during the period between the breach and the judgment, it could have, and, in fact,

---

**41.** Cases from other circuits also support this position. *See, e.g., Gelfgren v. Republic National Life Insurance Co.,* 680 F.2d 79, 82 (9th Cir.1982) (case, removed to federal court under ERISA, addressing prejudgment interest issue); *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988, 989 (6th Cir.1982) (case involving prejudgment interest under Labor Management Relations Act and ERISA).

**42.** The first three factors were considered by the Ninth Circuit in *Gelfgren v. Republic Na-*

*tional Life Insurance Co.,* 680 F.2d 79, 82 (9th Cir.1982). Moreover, the factors are in keeping with the consideration of prejudgment interest discussed by the Third Circuit in *Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 589 (3d Cir. 1975) and *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342, *rehearing denied,* 425 U.S. 908, 96 S.Ct. 1502, 47 L.Ed.2d 758 (1976).

would have, invested it, thereby generating income for the fund. Thus, prejudgment interest is necessary to compensate for this lost revenue.

Finally, the Court sees no equitable considerations that militate against prejudgment interest. Rather, all equitable considerations, that the Court can think of, weigh in favor of prejudgment interest.

In awarding prejudgment interest in this action, the Court looks to the Pennsylvania legal rate of interest, which is 6 percent.[43] 41 P.S. § 202. In order to avoid confusion, the Court will calculate and detail the interest due on each amount below.

First, the Court addresses the $170,780.36 outstanding loan debt. It must be remembered that all loans called for 9 percent interest, which was added to the figures already set forth in this Opinion.[44] Therefore, the Court will award prejudgment interest to the amounts set forth from the date that those amounts are calculated to.[45] The Court adds that it will restrict its calculations to a monthly, rather than daily, basis.

The Court previously calculated the principal and interest due to the plans, as of February, 1976, on a loan to Superior to be $78,175. Six percent simple interest on that amount from February, 1976, through the date of judgment (7 years, 1 month) is $33,224.38.

All other amounts of the loans were calculated as of March, 1976. As of that time, March, 1976, there remained $92,605.36 outstanding. Six percent simple interest on that amount from March, 1976, through the date of judgment (7 years) amounts to $38,894.25.

Next, the Court addresses the prejudgment interest due on the unpaid contributions.[46] The Court first addresses the contributions due to the Bollinger Salaried Plan. Initially, the Court notes that as of March, 1976, Bollinger owed $14,269.18 in employee contributions. That figure is comprised of $5,117.60 due as of December 18, 1974; $6,522.24 due as of December 18, 1975; and $2,629.34 due as of March 31, 1976. Joint Appendix, Joint Exhibits 46 and 47 (pp. 519, 527). Six percent simple interest on $5,117.60 from December, 1974, through the time of judgment (8 years, 3 months) is $2,533.21. Six percent simple interest due on $6,522.24 from December, 1975, through the time of judgment (7 years, 3 months) is $2,837.17. Six percent simple interest due on $2,629.34 from March, 1976, through the date of judgment (7 years) is $1,104.32. These three interest figures total $6,474.70.

As of March, 1976, Bollinger owed $14,391.45 in employer contributions. That figure is comprised of $5,552.30 due as of December, 1974, and $8,839.15 due as of December, 1975. Joint Appendix, Joint Exhibit 46 (pp. 526–527). Six percent simple interest on $5,552.30 from December, 1974, through the date of judgment (8 years, 3 months) is $2,748.39. Six percent simple interest on $8,839.15 from December, 1975, through the date of judgment (7 years, 3 months) is $3,845.03. These two interest amounts total $6,593.42.

Bollinger also owed contributions to the Bollinger Union Plan. The amount owed, as of March, 1976, was $26,864. This figure is comprised of $9,026.50 due as of October 31, 1974; $10,078.50 due as of October 31,

---

**43.** All interest calculations will be simple interest; interest will not be compounded.

**44.** The Court does acknowledge that certain loan payments were attributed directly to principal, without the payment of interest. However, the Court cannot award interest for these amounts because the interest cannot be calculated from the record. *See Girard Bank v. John Hancock Mutual Life Insurance Co.,* 524 F.Supp. 884 (E.D.Pa.1981), *aff'd. without opinion,* 688 F.2d 820 (3d Cir.1982).

**45.** For example, the amount of the loans owed by Superior, $78,175, is claimed and calculated through February of 1976 (*see* pp. 1490–1491 of this Opinion). Thus, prejudgment interest on that amount will be calculated from February, 1976, forward.

**46.** The Court can ascertain, from the record, the dates that these amounts came due. There was no interest previously added to these amounts; therefore, the Court will calculate interest from the due date.

1975; and $7,759 due as of March, 1976. Joint Appendix, Joint Exhibit 50 (pp. 544–581). Six percent simple interest on $9,026.50 from October, 1974, through the date of judgment (8 years, 5 months) is $4,558.38. Six percent simple interest on $10,078.50 from October, 1975 through the date of judgment (7 years, 5 months) is $4,484.93. Six percent simple interest on $7,759 from March, 1976, through the time of judgment (7 years) is $3,258.78. These interest figures total $12,302.09.

The final contribution amount outstanding is $16,642.84 owed the Portersville Union Plan by Portersville. This figure is comprised of $5,271.75 due as of September, 1974, and $11,371.09 due as of September, 1975. Joint Appendix, Joint Exhibit 52 (pp. 600–602). Six percent simple interest on $5,271.75 from September, 1974, through the date of judgment (8 years, 6 months) is $2,688.59. Six percent simple interest of $11,371.09 from September, 1975, through the time of judgment (7 years, 6 months) is $5,116.99. These two interest figures total $7,805.58.

The next figure confronting the Court is the rental payments of $3,053.98 made by three of the plans to Economy. It is not quite clear from the record when these payments were made, but it is apparent that they were paid no later than July, 1976. Joint Appendix, Joint Exhibit 35 (p. 362). Therefore, the Court calculates 6 percent simple interest on $3,053.98 from July, 1976, through the time of judgment (6 years, 8 months) as $1,221.59.

The final figure to consider for purposes of prejudgment interest is the $2,040 in missing treasury notes, which Greene converted to his own use. The first payment of $680 was dated August of 1978. Joint Appendix, Joint Exhibit 56 (p. 612). Six percent simple interest on that amount from August, 1978, through the time of judgment (4 years, 7 months) is $187. The second payment of $680 was dated February, 1979. Joint Appendix, Joint Exhibit 58 (p. 620). Six percent interest on that amount from February, 1979, through the time of judgment (4 years, 1 month) is $166.60. The final payment of $680 was dated August, 1979. Joint Appendix, Joint Exhibit 60 (p. 628). Six percent interest on that figure from August, 1979, through the time of judgment (3 years, 7 months) is $146.20. These figures total $499.80.

These prejudgment interest figures total $107,015.61.

### Conclusion

At this point, the Court totals the liability of the various parties. The Court finds defendants Greene and Allen liable, jointly and severally, for the amount of the outstanding loans—$170,780.36; the amount of the outstanding contributions—$72,167.47; the rental amount paid by the plans to Economy—$3,053.98; and the amount of prejudgment interest on these amounts—$106,516.01, for a total liability of $352,-517.82. Moreover, the Court holds defendant Economy liable, jointly and severally with defendants Greene and Allen, for the amount of rental payments, $3,053.98, plus the prejudgment interest on that amount of $1,221.59, for a total liability of $4,275.57. Finally, the Court holds defendant Greene individually liable for the amount of the United States Treasury Note interest payments that were converted, $2,040, plus the prejudgment interest on that amount of $499.80, for a total liability of $2,539.80.

An appropriate Order will be issued.

### EXHIBIT

### STIPULATION OF FACTS

This stipulation is entered into only for the purposes of this action. This stipulation does not preclude the presentation by either party of additional evidence.

In accordance with the terms set forth above, and not conceding the relevance or materiality of any of the facts set forth below, the plaintiff Pension Benefit Guaranty Corporation and the defendants Morton J. Greene, Thomas R. Allen, Jr., and Economy Industrial Properties hereby stipulate:

1. Plaintiff, Pension Benefit Guaranty Corporation (the "PBGC"), is a wholly-owned United States Government corporation created by Section 4002 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1302 (1976) (as amended by Pub.L. No. 96–364 (1980)), to administer the mandatory pension plan termination insurance program created by Title IV of ERISA. 29 U.S.C. §§ 1301–1381.

2. This action involves four Pennsylvania corporations—Kincaid Industries, Inc. ("Kincaid"), Bollinger Corporation ("Bollinger"), Portersville Equipment Company ("Portersville"), and Superior Wall Products Company ("Superior")—a partnership, defendant Economy Industrial Properties ("Economy"), and four pension plans—the Bollinger Corporation Union Employees Pension Plan (the "Bollinger Union Plan"), the Bollinger Corporation Salaried Employees Pension Plan (the "Bollinger Salaried Plan"), the Portersville Equipment Company Union Employees Pension Plan (the "Portersville Union Plan") and the Portersville Equipment Company Salaried Employees Pension Plan (the "Portersville Salaried Plan") (collectively referred to as the "Plans"). Joint Exhibits 1, 2, 3, 4.

3. At all relevant times, defendant Morton J. Greene was a director, officer, or shareholder of Kincaid, Bollinger, and Portersville, and a half-partner in Economy.

4. At all relevant times, defendant Thomas R. Allen, Jr., was a director, officer, or shareholder of Kincaid, Bollinger, and Portersville, and a half-partner in Economy.

5. At all relevant times, Superior was a wholly-owned subsidiary of Kincaid. Mr. Herbert S. Zveitel was president of Superior from 1970 to 1976. From 1970 on, Superior's operations were not profitable. Joint Exhibits 5, 6, 62.

6. At all relevant times, Portersville was a wholly-owned subsidiary of Bollinger.

7. From 1965 until 1975, Kincaid owned at least 80% of the outstanding stock of Bollinger. In 1975, Kincaid distributed the stock of Bollinger to Mrs. Greene and other family members in satisfaction of debts owed by Kincaid to Mrs. Greene and others. Kincaid was then, and continues to be, insolvent.

8. In February 1976, Superior permanently ceased operations. At that time, it was insolvent.

9. Bollinger and Portersville suffered losses in the fiscal years ending October 31, 1973, and October 31, 1974. Joint Exhibit 7.

10. On March 31, 1976, Bollinger filed a petition for arrangement under Chapter XI of the Bankruptcy Act. On March 14, 1977, this proceeding was converted to a straight bankruptcy. Carl L. Bigler was Bollinger's receiver and trustee-in-bankruptcy. Bollinger's assets were liquidated.

11. On April 19, 1976, Portersville filed a petition for arrangement under Chapter XI of the Bankruptcy Act. Mr. Bigler was Portersville's receiver. Portersville's assets were liquidated.

12. Kincaid, Bollinger, Superior, Mr. Greene and Mr. Allen are parties in interest, within the meaning of 29 U.S.C. § 1002(14), with respect to the Bollinger Salaried Plan and the Bollinger Union Plan. Kincaid, Portersville, Superior, Mr. Greene and Mr. Allen are parties in interest, within the meaning of 29 U.S.C. § 1002(14), with respect to the Salaried Plan and the Portersville Union Plan.

13. The Plans are tax-qualified defined benefit pension plans which are covered by Title IV of ERISA. The Bollinger Union Plan terminated effective December 20, 1976. The Bollinger Salaried Plan terminated effective February 17, 1977. The Portersville Union Plan and the Portersville Salaried Plan terminated effective July 26, 1976. The PBGC is statutory trustee of each of the Plans. Joint Exhibits 8, 9, 10, 11.

14. The pension benefits under the Plans were funded through four separate trusts. Joint Exhibits 2, 3, 12, 13.

15. Mr. Greene and Mr. Allen became trustees of the trusts for the Bollinger plans in the middle 1960's and of the Por-

tersville plans in 1970. By separate undated letters, Mr. Greene and Mr. Allen purportedly resigned as trustees. Neither Mr. Greene nor Mr. Allen notified the banks or brokerage house where the Plans maintained accounts or participants of their resignations. No successor trustees were appointed by Bollinger or Portersville. Joint Exhibits 14, 15.

16. On June 30, 1975, the U.S. Department of Labor granted Mr. Greene's application for postponement of the effective date of certain fiduciary responsibility provisions in regard to each of the Plans. Joint Exhibit 16.

17. Until the termination of his employment by Bollinger in the summer of 1976, Mr. Greene performed whatever administrative acts were necessary in regard to the Plans. Joint Exhibit 17.

18. By letter dated April 26, 1976, Mr. Greene notified the PBGC of the status of the Portersville plans. Joint Exhibit 18.

19. By letter dated April 28, 1976, Mr. Greene wrote to the United Steelworkers of America concerning the Portersville Union Plan. Joint Exhibit 19.

20. By letter dated May 20, 1976, Mr. Greene wrote to the PBGC concerning the status of the Portersville plans. Joint Exhibit 20.

21. In July 1976, Mr. Greene filed a notice with the PBGC in regard to Portersville's plans. Joint Exhibit 21.

22. By letter dated September 20, 1976, the Internal Revenue Service notified Portersville concerning the status of the Plan. Joint Exhibit 22.

23. On October 1, 1976, the Bankruptcy Court issued an order authorizing Mr. Bigler, as Bollinger's receiver, to retain Mr. Greene. Joint Exhibit 23.

24. By letter dated October 22, 1976, Mr. Greene notified the PBGC of the status of the Bollinger plans. Joint Exhibit 24.

25. In December 1976 and February 1977, Mr. Greene filed notices with the PBGC in regard to Bollinger's plans. Joint Exhibits 25, 26.

26. At all relevant times, each of the Plans kept assets in investment accounts with either Dean Witter Reynolds, Inc. or with Money Market Management, Inc. and checking or savings accounts with either the Beaver Trust Company, Beaver, Pennsylvania; Western Pennsylvania National Bank, Pittsburgh and Mt. Lebanon, Pennsylvania; First National Bank and Trust Co., Washington and Pittsburgh, Pennsylvania; Union National Bank, Pittsburgh and Mt. Lebanon, Pennsylvania, Mt. Lebanon Federal Savings and Loan Association, Pittsburgh and Mt. Lebanon, Pennsylvania; and Equibank, N.A., Pittsburgh and Mt. Lebanon, Pennsylvania.

27. After 1971, until they were turned over to the PBGC, the checkbooks, passbooks and other documents relating to those accounts were in Mr. Greene's possession.

28. In 1970, Superior owned the building that housed its operations. In late 1970, the building was destroyed by fire. Superior first attempted to obtain financing to rebuild from banks. When these efforts were unsuccessful at acceptable terms, Mr. Greene and Mr. Allen agreed, on behalf of the Plans, to loan Superior money. In return, the Plans were given a security interest in all of Superior's machinery, equipment, inventory, and present and future accounts and contract rights. The Plans initially advanced Superior $39,200. In 1972, additional amounts were advanced. In September 1975, Superior paid the principal due on its debt to the Bollinger Union Plan. By 1976, Superior's debt to the other plans, including accrued interest, equalled $78,175. Joint Exhibits 27, 28.

29. In 1975, Superior sold its building to Economy and immediately leased it back. Joint Exhibits 29, 30, 31.

30. On February 17, 1976, the Bollinger Salaried Plan, the Portersville Salaried Plan and the Portersville Union Plan entered into an agreement with Superior and Economy. Joint Exhibit 32.

31. On February 18, 1976, Mr. Greene wrote to Stephen Shaiman, Esq. Joint Exhibit 33.

32. By letters dated February 28, 1977, Mr. Allen informed the PBGC of amounts allegedly owed Economy by the Plans. Joint Exhibits 34, 35.

33. On March 8, 1976, Economy entered into an agreement for sale of the building formerly occupied by Superior. Joint Exhibit 36.

34. In 1972, 1973 and 1974, the Portersville Union Plan made six unsecured loans to Kincaid. As of October 1, 1975, these loans, including accrued interest, totalled $36,083. Kincaid has not repaid any principal or interest on these loans. Joint Exhibits 37, 38.

35. In 1973, the Portersville Salaried Plan made two loans to Bollinger totalling $3,750 and took back unsecured notes. Bollinger made one payment of $550 in regard to these loans. Joint Exhibits 39, 40.

36. In 1971, the Bollinger Salaried Plan made a loan of $11,000 to Bollinger and took back an unsecured note. Joint Exhibit 41.

37. In November 1973, the Bollinger Salaried Plan made a loan of $8,700 to Bollinger and took back an unsecured note. Joint Exhibit 42.

38. After 1973, Bollinger could not afford to make contributions to the Bollinger Salaried Plan. Consequently, in January 1973, Bollinger issued two checks, totalling $7,330.50, to the Bollinger Salaried Plan and that plan simultaneously issued a check for $7,000 to Bollinger and took back an unsecured note for that amount and in August 1974, Bollinger issued a check to the plan in the amount of $8,531.50, and the plan simultaneously issued a check to Bollinger in the amount of $8,500 and took back an unsecured note for that amount. Joint Exhibits 43, 44.

39. From time to time, Bollinger made payments in regard to the notes held by the Bollinger Salaried Plan. Bollinger's last payment was made in the spring of 1976. As of July 17, 1976, the outstanding balance on these notes and loans was $27,850 in principal and $8,304.47 in interest. Joint Exhibit 45.

40. After August 1974, Bollinger made no contributions to and issued no notes to the Bollinger Salaried Plan. Joint Exhibits 45, 46.

41. After 1973, Bollinger could not afford to make contributions to the Bollinger Union Plan. Consequently, in January 1973, Bollinger issued a check for $9,127 to the Bollinger Hourly Plan and the plan simultaneously issued a check to Bollinger for $9000 and took back an unsecured note for that amount and in February 1974, Bollinger issued a check to the Bollinger Union Plan for $8,682.80 and the plan simultaneously issued a check for $8600 and took back an unsecured note for $8600. Joint Exhibits 47, 48.

42. In November 1973, the Bollinger Union Plan made a loan to Bollinger of $5,850 and took back an unsecured note. Joint Exhibit 49.

43. From time to time, Bollinger made payments in regard to the notes held by the Bollinger Union Plan. As of July 15, 1976, the outstanding balance on the loan and notes was $13,100 in principal and $4,513.75 in interest. Joint Exhibit 50.

44. After February 1974, Bollinger made no contributions to or issued any notes to the Bollinger Union Plan. Joint Exhibits 50, 51.

45. Portersville did not make contributions to the Portersville Union Plan for the plan years 1974, 1975, and 1976, and did not make contributions to the Portersville Salaried Plan for the plan years 1972, 1975 and 1976. Joint Exhibits 52, 53.

46. Participants in the Bollinger Salaried Plan were required to make contributions to help fund their benefits. These contributions were made through deductions from their paychecks. Between 1953 and 1976, Bollinger deducted the appropriate amount from the amount paid to employees, but, beginning in 1973, because of

Bollinger's financial condition, Bollinger did not forward all of these amounts to the trust. Joint Exhibit 54.

47. On June 29, 1979, Mr. Greene sent a letter to the PBGC. Joint Exhibit 55.

48. On August 31, 1978, Reynolds issued a check for $680 to the trust for the Bollinger Union Plan. In September 1978, that check was deposited in an account at the Mellon Bank, N.A. maintained in the name of Mr. and Mrs. Greene. Although the PBGC was then statutory trustee of that plan, neither the check nor the proceeds from it were paid to the PBGC. Joint Exhibits 56, 57.

49. On February 28, 1979, Reynolds issued a check for $680 to the trust for the Bollinger Union Plan. That check was indorsed with the name Morton J. Greene and cashed at the Union National Bank in March 1979. Although the PBGC was then statutory trustee of that plan, neither the check nor the proceeds from it were paid to the PBGC. Joint Exhibits 58, 59.

50. On August 31, 1979, Reynolds issued a check for $680 to the trust for the Bollinger Union Plan. That check was deposited in September 1979 at the Mt. Lebanon branch of the Mellon Bank, N.A., in an account maintained in the name of Anne S. Greene, wife of Mr. Greene. Although the PBGC was then statutory trustee of that plan, the proceeds from the check were not paid to it. Joint Exhibits 60, 61.

51. The documents contained in the appendix and designed as Joint Exhibits 1–62 are true, correct and complete copies of the documents they purport to be.

/s/ Leonard I. Fischer
LEONARD I. FISCHER

Attorneys for Defendants
BERKMAN, RUSLANDER, LIEBER,
 POHL & ENGEL
20th Floor, Frick Building
Pittsburgh, Pa.

/s/ Stephen D. Schreiber
STEPHEN D. SCHREIBER
Trial Attorney

Attorneys for Plaintiff
PENSION BENEFIT GUARANTY CORPORATION
Office of the General Counsel
2020 K Street, N.W.
Washington, D.C. 20006
(202) 254–4895