921 F.2d 425
 59 USLW 2480, 13 Employee Benefits Ca 1329
 Robert REICHELT, Catherine Pelletier, Paul S. Juzwishen,
Allen A. Michewich, Frank A. Misiewicz, William J. Mueller,
Joseph M. Scavone, Linda A. Shingara, John D. Sweeney, Henry
W. Wajdowicz, and All Class members, Plaintiffs-Appellants,
v.
EMHART CORPORATION, USM Corp., and Royal E. Cowles,
Defendants-Appellees.
 No. 326, Docket 90-7400.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 3, 1990.
Decided Dec. 11, 1990.
 
 David S. Maclay, Bridgeport, Conn. (Marsh, Day & Calhoun, Bridgeport, Conn., on the brief), for plaintiffs-appellants.
 Mark S. Dichter, Philadelphia, Pa. (Sarah A. Kelly, Morgan, Lewis & Bockius, Philadelphia, Pa., William G. Bruner, III, The Black & Decker Corporation, Towson, Md., on the brief), for defendants-appellees.
 Before FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Robert Reichelt et al. appeal from a judgment of the United States District Court for the District of Connecticut, Alan H. Nevas, Judge, dismissing their complaint seeking severance benefits from their former employer, defendant Emhart Corp. ("Emhart"), et al., under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1001 et seq. (1988), and under common-law contract principles, in connection with Emhart's sale of the division in which plaintiffs were employed. The district court granted summary judgment dismissing the complaint on the grounds that (1) an employer's refusal to pay severance benefits in connection with the sale of part of the company does not violate ERISA, and (2) ERISA preempted plaintiffs' breach-of-contract claims. On appeal, plaintiffs contend that they were entitled to partial summary judgment in their favor under either ERISA or common-law contract principles. For the reasons below, we reject their contentions and affirm the judgment of the district court.I. BACKGROUND
 
 
 2
 The pertinent facts are not in dispute. Prior to May 1986, plaintiffs were salaried employees of the Farrel division of defendant USM Corp. ("USM"), which was a wholly-owned subsidiary of Emhart (collectively the "Company"). Plaintiffs were employed in the Company's Ansonia, Connecticut plant in either the "roll shop" or the "machine shop." On average, they had been employed in these operations for approximately 20 years. In 1986, Emhart sold the roll shop to SHW Corporation ("SHW") and sold the machine shop to Liebergesell Group ("LG").
 
 
 3
 A. The 1986 Sales and Denial of Severance Benefits to Plaintiffs
 
 
 4
 In April 1986, the Company informed roll shop employees by letter that the sale of that shop to SHW was imminent and that upon the sale their employment with the Company would cease. The letter did not mention severance benefits. The sale of the roll shop took place on Friday May 2, 1986. On that day, SHW made written offers of employment to salaried roll shop employees. On the same day, roll shop employees met with Company executives, who formally reported the sale and informed them that if they were offered employment with SHW they would not receive severance pay from Emhart. Thereafter, as discussed in Part I.B. below, Emhart adopted a plan providing that severance benefits could be paid to an employee who was offered employment with SHW only if he or she accepted the offer and SHW terminated the employment before the end of 1986.
 
 
 5
 The May 2 SHW offers specified that they were to be accepted by the start of business on Monday, May 5. All of the plaintiff roll shop employees accepted and began work with SHW on May 5. Emhart had these employees sign a "Change of Status" form which described their departure as "Termination due to Roll Shop sale to SHW. Employee to be hired by SHW."
 
 
 6
 The salaried machine shop employees were treated similarly. On or about May 12, they received letters from Emhart stating that the sale of that shop to LG was imminent and that their employment with Emhart would be terminated. The letters stated that those offered employment with LG would not receive severance pay; thereafter Emhart adopted a plan that could entitle them to severance benefits if their employment were terminated by LG in 1986. On May 13, all of the plaintiff machine shop employees accepted offers of employment from LG.
 
 
 7
 Following the sales, plaintiffs' tasks, hours, and salaries with their new employers were the same as they had been with Emhart. Their benefits were slightly different; in particular, the new employers did not give them credit, for severance pay purposes, for their years of employment by the Company. None of the plaintiffs had his or her employment terminated by the purchaser in 1986 and hence none received severance pay from Emhart.
 
 
 8
 B. The Pre-1986 Severance Pay Practices and the 1986 SUB Plans
 
 
 9
 Prior to Emhart's sale of these two shops, various severance pay practices had been followed. Until 1968, the roll and machine shops were owned by Farrel Corporation ("Farrel"), an independent company. In 1968 Farrel was sold to USM, itself then an independent company; no severance benefits were paid to employees who continued to work for USM. In 1976, the stock of USM was sold to Emhart; no severance benefits were paid to employees who continued to work for the Company.
 
 
 10
 In 1980, Emhart, which had made many corporate acquisitions, began to consider the adoption of a uniform severance policy for all of its subsidiaries and divisions. It considered adopting a written policy that would have, inter alia, specifically excluded from severance pay eligibility those employees who retained their positions when the division in which they were employed was sold as a going concern. In December 1981, the Emhart Corporate Compensation Committee declined to adopt this or any other written severance policy. On one draft severance plan, Emhart's Vice President for Administration, Sherman Carpenter, wrote, "Terminate all existing plans. Establish guidelines--not ERISA policy." Carpenter issued a formal memorandum dated December 17, 1981, stating that "all severance policies currently in effect at all U.S. operating units are to be cancelled and eliminated from policy manuals as of December 31, 1981." (Emphasis in original.) The memorandum continued:
 
 
 11
 As the need arises for severance pay considerations in the future, each respective unit manager should inform group management. Group management should contact the Corporate Vice President Human Resources for final authorization of any severance payments.
 
 
 12
 No formal plan was adopted, and Emhart did not have a formal written policy at the time of the 1986 sales.
 
 
 13
 From 1981 to the time of the 1986 sales, it was Emhart's practice to grant some severance pay to employees of the roll and machine shops who were involuntarily terminated for reasons other than cause. The employee's supervisor or the human resources director would recommend severance pay, and the recommendation would be reviewed by defendant Royal E. Cowles, Emhart's Vice President for Human Resources. Between December 17, 1981, and May 1986, Cowles received severance pay recommendations for 29 salaried employees in those Ansonia operations, and in each case he approved a payment. Of those employees, 19 received the equivalent of one week's pay for each year of service; six received more than one week's pay per year of service, and four received less. The record does not indicate that Cowles rejected a recommendation for severance pay for any roll or machine shop employee during this period.
 
 
 14
 None of the Ansonia employee terminations during the 1981-1986 period resulted from the sale of part of the business as a going concern. During this period Emhart sold many of its other divisions and subsidiaries, however, and its uniform practice in connection with those sales was to adopt a formal, written ERISA plan to cover persons who would become unemployed as a result of the sale, and not to pay severance pay to employees who continued their employment with the purchaser.
 
 
 15
 In May 1986, Emhart adopted "Supplemental Unemployment Benefits" plans ("SUB" plans) for roll and machine shop employees involuntarily terminated in 1986. In addition to providing for severance pay to employees laid off between February 1 and the dates the shops were sold, the SUB plans principally granted severance benefits to salaried employees still employed by Emhart who were not offered positions by SHW and LG. In addition, these plans provided that those who were offered and accepted positions with SHW and LG could receive severance pay if their employment were terminated by the purchaser in 1986. The SUB plans for roll shop and machine shop employees, respectively, stated that
 
 
 16
 [a]ny covered Roll Shop employee employed by USM on the date of sale and employed by SHW Incorporated after the date of sale of the Roll Shop, will also be eligible to receive supplemental unemployment benefits if he is permanently laid off by SHW Incorporated during 1986....
 
 
 17
 and
 
 
 18
 [a]ny covered Machine Shop employee employed by USM on the date of sale and employed by [LG] after the date of sale of the Machine Shop will also be eligible to receive supplemental unemployment benefits if he is permanently laid off by [LG] during 1986....
 
 
 19
 The amount of benefits in each case was to be one week's pay for each full year of continuous service with USM, minus any "notification pay."
 
 
 20
 C. The Present Action and the Decision Below
 
 
 21
 Beginning in 1986, several of the plaintiffs commenced actions in state court, which were removed to the district court and consolidated into the present action on behalf of some 220 plaintiffs. Plaintiffs contended that under Emhart's pre-1986 policy, they had accrued rights to severance benefits and that Emhart's failure to pay those benefits upon the sale of the roll and machine shops violated their rights under ERISA and under common-law contract principles. Following a period of discovery, defendants moved for summary judgment dismissing the complaint; plaintiffs cross-moved for partial summary judgment in their favor on the issue of liability.
 
 
 22
 In a Ruling on Cross Motions for Summary Judgment dated February 16, 1990, the district court denied plaintiffs' motion and granted defendants' motion to dismiss. The court found that, assuming Emhart's pre-1986 policy was a de facto ERISA plan, Emhart was free to modify, restrict, or terminate it without violating ERISA. Since it was clear that plaintiffs were not entitled to severance benefits under the SUB plans, the court concluded that plaintiffs' ERISA claims were without merit. Further, the court ruled that ERISA preempted plaintiffs' breach-of-contract claims.
 
 
 23
 Upon plaintiffs' motion for reconsideration, the court adhered to its decision, and judgment was entered dismissing the complaint. This appeal followed.
 
 II. DISCUSSION
 
 24
 On appeal, plaintiffs contend principally (1) that the district court erred in ruling that Emhart was not obligated under ERISA to award them severance pay in accordance with the practice followed prior to the sale of the roll and machine shops, and (2) that under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), plaintiffs' claims should be adjudicated in accordance with common-law contract principles. We disagree.
 
 A. The ERISA Claims
 
 25
 In support of their contention that they were entitled to severance benefits under ERISA, plaintiffs argue principally that Emhart's SUB plans were "irrelevant," that ERISA did not permit Emhart to adopt the SUB plans in modification of its prior practice, and that under the prior practice, plaintiffs were entitled to severance pay. Neither the law nor the record supports plaintiffs' position.
 
 
 26
 Plaintiffs contend that though Emhart had no written severance benefit plan from 1981 to May 1986, its unvarying practice during that period constituted a de facto ERISA plan requiring severance pay to any employee who was terminated involuntarily. Even if we accept for purposes of this appeal the proposition that Emhart's pre-1986 practice was an ERISA plan, plaintiffs cannot prevail since (1) ERISA did not prohibit Emhart from amending the plan to deny severance pay to employees offered positions by the purchaser when the operation in which they were employed was sold as a going concern, and (2) even if Emhart's prior practice remained in effect, there was no indication that under that practice severance benefits would be paid to employees whose operation was sold as a going concern and who continued to work for the purchasers.
 
 
 27
 ERISA governs two types of employee benefit plans: those that provide for "pension" benefits, see 29 U.S.C. Sec. 1002(2), and those that provide for "welfare" benefits, see id. Sec. 1002(1). In recognition of the expense of maintaining and administering employee benefit plans, Congress structured ERISA to impose the most stringent requirements in connection with pension plans and left the employer with considerable flexibility with respect to welfare plans. See, e.g., S.Rep. No. 383, 93d Cong., 2d Sess. 18, reprinted in 1974 U.S.Code Cong. & Admin.News ("USCCAN") 4639, 4890, 4904 (Congress sought to "keep[ ] costs within reasonable limits"); id. at 51, USCCAN at 4935 (requiring vesting of ancillary benefits "would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income"). Thus, employee pension benefit plans are subject to elaborate accrual, vesting, and funding requirements. 29 U.S.C. Secs. 1051-1085. On the other hand, welfare benefit plans, though subject to certain disclosure and fiduciary requirements, see id. Secs. 1021-1031, 1101-1114, "are exempt from the more stringent ERISA requirements," Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir.), cert. denied, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988), and welfare benefits are thus unaccrued and nonvested.
 
 
 28
 An unfunded severance plan is an "employee welfare benefit plan" under Sec. 1002(1). Gilbert v. Burlington Industries, Inc., 765 F.2d 320, 325 (2d Cir.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986); accord Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1145 (4th Cir.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); Adams v. Avondale Industries, Inc., 905 F.2d 943, 947 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); Scott v. Gulf Oil Corp. 754 F.2d 1499, 1503 (9th Cir.1985); see also Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 17-18, 107 S.Ct. 2211, 2220-21, 96 L.Ed.2d 1 (1987); Schwartz v. Newsweek, Inc., 827 F.2d 879, 881 n. 2 (2d Cir.1987) (" Fort Halifax ... adopted [Gilbert v. Burlington Industries'] holding ... that an employer severance pay plan ..., which pays benefits on an ongoing basis to employees severed under certain circumstances, is an 'employee welfare benefit plan' under ERISA.").
 
 
 29
 Since severance benefits are welfare benefits and an employee's interest in a welfare benefit plan is not vested, the employer has no continuing obligation to provide severance benefits; under ERISA, the employer has the right at any time to amend or terminate a severance pay plan. See, e.g., Adams v. Avondale Industries, Inc., 905 F.2d at 947 (employer may freely amend ERISA severance pay plan); Young v. Standard Oil (Indiana), 849 F.2d at 1045 (employer is "free to alter or eliminate severance benefits ... without consideration of the employees' interests"); Sutton v. Weirton Steel Division of National Steel Corp., 724 F.2d 406, 410 (4th Cir.1983) (ERISA does not prohibit modification of severance plans because Congress believed the vesting of such benefits would be too costly), cert. denied, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984); see also Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.1986) ("ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued"), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987).
 
 
 30
 Since an employer has the right under ERISA to amend or eliminate a severance benefit plan at any time, a fortiori it may do so in the context of the sale of a part of its business as a going concern. Further, a number of courts have suggested that with respect to employees who continue comparable employment with the purchaser of the business, supplementing their salary checks from the purchaser with severance payments from the prior employer would bestow a "windfall, because it would award severance pay to persons who never changed their jobs and were never out of work." Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1350 (4th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); accord Sly v. P.R. Mallory & Co., 712 F.2d 1209, 1211 (7th Cir.1983) ("To award severance benefits under these facts would result in a windfall to the employees who retained their positions with the purchaser of the going concern, which was clearly not the intention or goal of ... ERISA."); Schwartz v. Newsweek, Inc., 827 F.2d at 883 (quoting Sly); Lakey v. Remington Arms Co., 874 F.2d 541, 545 (8th Cir.1989) (severance benefits would be "windfall" where "change in employer ... caused the employees no lack of work").
 
 
 31
 Under these principles, Emhart was entitled to adopt its SUB plans, which, inter alia, specified its severance benefit policy with respect to roll and machine shop employees affected by the sale of the shop in which they were employed. Plaintiffs contend that the SUB plans are "irrelevant," arguing that they were intended to apply only to persons who had already been laid off by Emhart by the time of the shop sales and that "[t]he SUB plans contain no reference whatsoever to people like the plaintiffs who were actively employed on the day of sale." (Plaintiffs' brief on appeal at 13.) This contention is contradicted by the express terms of the SUB plans: the second group of employees listed in the "Eligibility" section of the roll shop SUB plan was salaried roll shop "employees employed by USM on the date of sale and employed by SHW after the date of sale." (Emphasis added.) The machine shop SUB plan was precisely parallel, making salaried machine shop "employees employed by USM on the date of sale and employed by [LG] after the date of sale" (emphasis added) conditionally eligible for severance benefits. The SUB plans provided that such an employee could become entitled to severance pay if the purchaser terminated his or her employment before the end of 1986.
 
 
 32
 In sum, the Emhart SUB plans in effect in May 1986 denied severance pay to any salaried roll shop or machine shop employee who was offered a position by the purchaser of his or her shop, but made those employees conditionally eligible for severance pay if they accepted those positions and were thereafter terminated by the purchaser during 1986. Since none of the plaintiffs was so terminated by SHW or LG, plaintiffs were not entitled to severance benefits.
 
 
 33
 Finally, we note that even if we concluded that Emhart was not permitted by ERISA to modify its pre-1986 "plan," plaintiffs could not prevail on their claims for severance benefits. Emhart had expressly rescinded its formal plans, and it had adopted the practice of allowing Cowles, its Vice President for Human Resources, to determine severance pay awards when he received recommendations for such payments. The record shows that in evaluating these recommendations, Cowles did not use any written criteria, standards, or guidelines. Assuming there had been no willful misconduct, Cowles evaluated the reason for the termination, "whether it was poor performance, lack of business, [or] the phase-out of an operation." When the reason was the sale of an operation as a going concern, he never authorized severance pay when a salaried employee was to continue in comparable employment with the purchaser. We disagree with plaintiffs' contention that Cowles's general use of a formula of one week's pay for each year of Company service demonstrated that his severance pay determinations were not discretionary. The use of a virtually uniform formula with respect to amount does not raise a genuine issue as to whether the decision on eligibility was discretionary. Since there was no sale of part of the roll shop or machine shop businesses as a going concern during that period, the Company did not have occasion to determine whether an employee of either of those shops would be awarded such pay if he or she accepted employment with a purchaser of the going concern. In all the circumstances, and given Emhart's uniform denial of severance pay to employees who had continued to work for purchasers of other subsidiaries or divisions sold as going concerns, we cannot conclude that a decision to deny severance pay to plaintiffs under the pre-1986 practice was arbitrary or capricious. See, e.g., Schwartz v. Newsweek, Inc., 827 F.2d at 882; see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. at 115, 109 S.Ct. at 956 (arbitrary-and-capricious standard applies to review of denial of ERISA benefits where benefit plan gives plan administrator or fiduciary discretionary authority to construe plan's terms or to determine eligibility for benefits).
 
 B. The Common-Law Contract Claims
 
 34
 ERISA preempts state law regarding any matters that "relate to" employee benefit plans. 29 U.S.C. Sec. 1144(a). ERISA was intended to occupy fully the field of employee benefit plans and to establish that field "as exclusively a federal concern." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). See also Fort Halifax Packing Co. v. Coyne, 482 U.S. at 7-8, 107 S.Ct. at 2215-16. Accordingly, ERISA preempts civil actions against employers for severance pay predicated on common-law contract principles. Gilbert v. Burlington Industries, Inc., 765 F.2d at 328.
 
 
 35
 Plaintiffs contend that under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, they may bring an action under ERISA to enforce rights created by common-law contract principles. They argue that ERISA's preemption of state law means only "that the parochial case law of one single state does not control the result," and that "[s]tate court common law decisions considered on a multi-state basis are not the decisions of 'state law' preempted by" ERISA. (Plaintiffs' brief on appeal at 36.) Thus, they contend that contract principles common to many states may be viewed as a sort of federal common law that ERISA does not preempt. Arguing further that under pre-ERISA state law, an employer's severance plan constituted a unilateral offer that employees accept by continuing to work for the employer, plaintiffs contend that an employer's elimination of a severance plan constitutes a breach of that contract. Plaintiffs rely principally on language in the Firestone opinion stating that the Court was rejecting a "reading of ERISA [that] would ... impose a standard of review that would afford less protection to employees ... than they enjoyed before ERISA was enacted." 489 U.S. at 114, 109 S.Ct. at 956. Given the narrow question considered in Firestone, this statement does not have the significance plaintiffs impute to it.
 
 
 36
 Prior to Firestone, most circuits had held that "[i]n actions challenging the denial of benefits under an ERISA plan, review is limited to determining whether the administrator's decision was arbitrary and capricious." Schwartz v. Newsweek, Inc., 827 F.2d at 881; see Bruch v. Firestone Tire and Rubber Co., 828 F.2d 134, 138 (3d Cir.1987) (collecting cases), aff'd in part and rev'd in part, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In Firestone, the Supreme Court held that unless the plan at issue gives the administrator discretionary authority to construe its terms or to determine eligibility, a denial of benefits based on plan interpretation is not to be reviewed under the arbitrary-and-capricious standard but rather must be reviewed de novo. 489 U.S. at 115, 109 S.Ct. at 956.
 
 
 37
 Firestone did not disturb the classification of severance pay plans as welfare benefit plans, and it therefore did not alter the principle that severance pay plans are modifiable or terminable at will by the employer. See, e.g., Adams v. Avondale Industries, Inc., 905 F.2d at 950 (nothing in Firestone "implies the invalidity of the case law excluding amendments of welfare benefit plans from scrutiny under ERISA's fiduciary duty requirements"). Cf. Belade v. The ITT Corp., 909 F.2d 736, 738 (2d Cir.1990) (per curiam ) (Firestone "does not purport to expand the scope of ERISA to include design decisions defining the parameters of a program"). Indeed, accepting plaintiffs' argument would nullify Congress's determination in structuring ERISA that welfare benefit plans such as severance plans should be exempted from the stringent vesting requirements applicable to pension benefit plans.
 
 
 38
 Firestone did not purport to effect any narrowing of ERISA's preemptive effect. It merely affected the standard for reviewing certain decisions interpreting ERISA plans.
 
 CONCLUSION
 
 39
 We have considered all of plaintiffs' arguments on this appeal and have found them to be without merit. The judgment of the district court dismissing the complaint is affirmed.