**Andrew C. HARDTKE, Plaintiff,**

v.

**EXIDE CORPORATION, Defendant.**

**Civ. A. No. 91–CV–4177.**

United States District Court,
E.D. Pennsylvania.

Feb. 4, 1993.

Richard Habgood, Morrisville, PA, for plaintiff.

Thomas M. Barton, Philadelphia, PA, for defendant.

### DECISION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

The plaintiff, Andrew C. Hardtke ("Hardtke"), brought this action against his former employer, the defendant, Exide Corporation ("Exide") for separation pay under Exide's "Separation Payment Policy For Salaried Employees" ("Separation Plan"). In the spring of 1984, a company known as the Richardson Division ("Richardson") of the Witco Corporation entered into an agreement with Exide to purchase Exide's Stokes Molded Products Division ("Stokes"). On or about December 14, 1984, Hardtke was denied separation pay on the grounds that 1. Richardson had made him an offer of continued employment and 2. he had been terminated prior to the sale for acts that were detrimental to Exide.

On December 10, 1992, a bench trial was held in the above-captioned matter.[1] After reviewing the testimony, the exhibits presented at trial, and the deposition of Gerald E. Turner,[2] we make the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).[3]

## II. FINDINGS OF FACT

1. Hardtke was employed as a salesman at Exide's Stokes Division in Trenton, New Jersey from April 13, 1959 to December 14, 1984. He was continually employed by Exide during this period.

2. In the spring of 1984, Richardson entered in an agreement with Exide to purchase Stokes.

3. In August of 1984, Hardtke met several times with Richardson representatives, including Gerald Turner, who was Vice President of Marketing, to discuss his continued employment as an industrial battery sales representative.

4. Richardson offered Hardtke continued employment at its Clark, New Jersey facility in the same sales position as he had held at Stokes, with comparable duties and responsibilities.

5. The Clark, New Jersey facility was 39 miles further from Hardtke's residence than his last place of employment with Exide in Trenton, New Jersey. Hardtke measured this distance on his car's odometer, using the most direct route.[4] Richardson never offered Hardtke reimbursement to relocate.

6. Exide had compensated Hardtke on the basis of a base salary plus commissions. In 1984, Exide paid Hardtke $27,683.74 in salary and $10,914 in commissions. In 1983, Hardtke received $26,061.64 in salary and $5,348 in commissions.

7. Exide's incentive program was set up to afford Hardtke the opportunity to earn the same or more commissions as the previous year.

8. Richardson does not pay any of its salesman on a commission basis, so it offered Hardtke a straight salary instead. This offer was calculated using Hardtke's base salary and its determination of his average commissions over several years prior to 1984.

9. Hardtke and Richardson were unable to agree as to his salary level. Hardtke indicated to Richardson that he could not accept their offer at such a salary. Richardson believed its offer was fair and never offered any additional compensation.

10. Hardtke never received an offer of employment from Exide, any of its subsidiaries, or affiliates.

11. On November 27, 1984, Arthur G. Koch, then-President of the Stokes Division met with Hardtke to inquire whether he would seek employment with Hardigg Industries ("Hardigg"), which was Stokes' primary competitor for the sale of industrial battery products, if he did not take the job with

---

1. The parties stipulated on the record that this action would be tried without a jury.

2. The deposition of Gerald E. Turner, who in 1984 was the Vice President of Marketing of the Richardson Division, was accepted into evidence by the Court.

3. The Court was unable to review the evidentiary record of Exide's decision to deny the plaintiff, Hardtke, separation pay under its Separation Plan because no such record ever existed.

4. Exide argues that Hardtke failed to provide competent evidence to support a finding that the Clark, New Jersey facility was 39 miles further from his residence. More specifically, Exide contends that Hardtke failed to demonstrate that he used the shortest route to measure the distance. We find that Hardtke has established that the Clark, New Jersey facility was 39 miles further from his residence and that he measured this distance in a car using the most direct route. Hardtke testified that he clocked the distance at 39 miles further from his residence. We have inferred that he knew and used the most direct route based on his 25 years of experience as a salesman in the area. Hardtke's testimony at trial gave us no reason to believe that he would take a longer route in order to support his claim for separation pay. Exide neither explored these avenues on cross-examination, nor offered any evidence that the distance was less than 35 miles. Indeed, Exide could have objected to Hardtke's testimony on the grounds that 1. Hardtke failed to properly authenticate this evidence and 2. his testimony was offered on redirect examination and was outside the scope of Exide's cross examination. We will not now permit Exide to impeach Hardtke's testimony through its post-trial brief.

Richardson. Koch was concerned because Hardtke had access to confidential marketing strategies and both Hardigg and Stokes called upon the same customers.

12. During their November 27, 1984 conversation, Koch asked Hardtke whether he had considered working for Hardigg. Hardtke responded that working for a competitor was a possibility as that was the type of work that he was familiar with, but that he was uncertain at that point.

13. Later that day, Koch told Hardtke to go home, not to perform any of his normal duties, and to await further instructions from him. The basis for this decision was Koch's determination that Hardtke's continuing in his present capacity while considering employment with a competitor was a conflict of interest.

14. Koch terminated Hardtke effective December 14, 1984. Koch was told by various members of his staff, including Marty Sessa, who was Hardtke's functional supervisor at Stokes, that they had heard rumor in the industry that Hardtke was negotiating for a job with Hardigg. Therefore, Koch terminated Hardtke because, in his judgment, for Hardtke to continue calling on customers while at the same time maintaining a relationship with Hardigg was detrimental to Stokes.

15. Neither Koch, nor his staff had any personal knowledge that Hardtke was negotiating for a position with Hardigg during the time that he was employed by Stokes.

16. Koch had planned to employ Hardtke until the date of the sale in early 1985.

17. The industry for industrial battery products is small and limited with very few competitors.

18. In September of 1984, Hardtke inadvertently encountered Jerry Custeau, a Hardigg's salesman, at the office of a mutual customer. Custeau knew that Stokes was about to be sold and, therefore, informed Hardtke that there was a possibility of an opening for his position at Hardigg because he was retiring in November.

19. Prior to his termination on December 14, 1984, this conversation was Hardtke's sole contact with anyone from Hardigg with respect to obtaining employment with Hardigg.

20. After his termination on December 14, 1984, Hardtke contacted Hardigg about employment and arranged to meet them at their plant in Massachusetts on December 17, 1984.

21. On December 17, 1984, Hardtke met with Hardigg Industries and arranged to take a physical examination on December 18, 1984. Hardtke took the physical and was hired by Hardigg on December 20, 1984. He was retroactively placed on Hardigg's payroll as of December 17, 1984. Thus, Hardtke was not unemployed for even one day.

22. Richardson took over the operation of Stokes in early 1985.

23. Hardtke's average weekly income from Exide for the twelve months prior to his termination was $779.13.

24. For purposes of separation pay, Hardtke was severed under Exide's Separation Plan, which was placed into effect on February 14, 1983.[5]

25. Exide's Separation Plan is applicable to "salaried employees of ... ('the Company') whose place of employment is in the United States."[6] The Separation Plan defines "Company" as the Exide Corporation.

26. Under the Separation Plan, eligible employees with one or more years of continuous service are entitled to a separation payment "of one week (1) of pay ... for each year of continuous service up to a maximum of twenty-six (26) weeks...." In the case of employees earning base pay plus commissions through a sales incentive plan, "pay" is defined as the average weekly earnings over the last twelve months prior to separation.

27. The stated purpose of Exide's Separation Plan is as follows:

---

5. The parties agree that this Separation Plan is determinative of Hardtke's eligibility for separation pay.

6. Exide's Separation Plan was introduced into evidence as Plaintiff's Exhibit 1.

[t]his policy is designed to provide assistance to salaried employees who lose employment as a result of a reduction in staff or an elimination of their position or the lack of available work consistent with the employees' qualifications and capabilities.

28. The Separation Plan excludes from eligibility employees who lose employment under the following circumstances:

Employees who voluntarily leave the employment of the Company;

Employees who die while employed by the Company;

Employees who qualify for disability pension or long term disability insurance;

Employees terminated for misconduct, insubordination, fraud, dishonesty, willful neglect of duties, intentional damage of Company property, disclosure of confidential information, or because of any other similar act detrimental to the Company;

Employees who were hired by the Company for a definite term or task;

Employees who are offered comparable ... employment by the Company or any or its subsidiaries or affiliates at a location which is less than thirty-five (35) miles further from their residence than their last place of employment with the Company or are offered reimbursement to relocate to a place of employment which is greater than thirty-five (35) miles;

Employees who leave the employment of the Company prior to their last day of work as scheduled by the Company.

29. The Separation Plan provides that the Company has sole discretion to determine whether an employee has received a "comparable offer of employment."

The decision as to whether the offered employment is "comparable" will be at the sole discretion of the Company.

30. Exide informed Hardtke that he was not eligible for separation pay under its Separation Plan because: 1. the Richardson Division had made him offer of continued employment with comparable duties, responsibilities, and compensation to the position that he had held with Stokes and 2. Hardtke was terminated for negotiating for a job with Hardigg while still employed with Stokes, which, in the Exide's judgment, was seriously detrimental to its Stokes Division.

31. Approximately 5 or 6 other employees of the sales and production staff at Stokes were also offered employment with Richardson in Clark, New Jersey. These employees were not paid separation pay under Exide's Separation Plan. These occurrences took place during the same time period in which Hardtke was denied separation pay.

## III. DISCUSSION

### A. JURISDICTION AND APPLICABLE LAW

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, provides a cause of action for any participant or beneficiary of a specified benefit plan to recover benefits due under the plan. 29 U.S.C. § 1132(a)(1)(B). The statute covers two types of plans, pension plans, 29 U.S.C. § 1002(2)(A), and welfare plans, 29 U.S.C. § 1002(1). Welfare plans include any "plan, fund, or program" established or maintained by an employer for the purposes of providing certain benefits to its employees or their beneficiaries. 29 U.S.C. § 1002(1). Benefit plans providing separation or severance pay are considered "welfare plans" governed by ERISA. *See, e.g., Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 430 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989). Thus, Hardtke's claim for separation pay under Exide's Separation Plan is governed by ERISA.

Our jurisdiction over Hardtke's claim is predicated upon federal question jurisdiction, 28 U.S.C. § 1331, and 29 U.S.C. § 1132(f), which grants the U.S. District Courts specific power to hear claims brought by plan participants under ERISA. Under 29 U.S.C. § 1132(a), a civil action may only be brought by a plan participant or beneficiary. This is both a standing and subject matter jurisdictional requirement. *Molnar v. Wibbelt,* 789 F.2d 244, 247 (3d Cir.1986); *Stanton v. Gulf Oil Corp.,* 792 F.2d 432, 434 (4th Cir.1986).

Exide's Separation Plan is applicable to salaried employees of Exide whose place of employment is in the United States. There is no dispute that the Separation Plan is applicable to Hardtke as a former salaried employee of Exide's Stokes Division in Trenton, New Jersey. ERISA defines a "participant" as "any employee or former employee of an employer ..., who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer...." 29 U.S.C. § 1002(7). Therefore, Hardtke is a participant of Exide's Separation Plan and entitled to bring this action.

### B. STANDARD OF REVIEW

■ As a threshold matter, we must determine the appropriate standard of review under ERISA to be applied to Exide's denial of separation pay benefits. Benefit denials under 29 U.S.C. § 1132(a)(1)(B) must be reviewed de novo, unless the "plan gives the administrator [7] authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). If a plan grants the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the Court's review of the decision is limited under the more deferential "arbitrary and capricious" standard. *Id.; Kotrosits v. Gatx Corp. Non–Contributory Pension,* 970 F.2d 1165, 1171 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). Hence, we must decide whether the Separation Plan grants Exide such discretionary authority in order to determine the appropriate level of review.

The Separation Plan disqualifies an employee from receiving separation pay when the employee is "offered comparable ... employment by the Company or any of its subsidiaries or affiliates at a location which is less than thirty-five (35) miles further from [his] residence than [his] last place of employment with the Company...." The Separation Plan expressly grants the Company discretionary authority to determine whether the offered employment is "comparable." Exide contends, therefore, that we should use the arbitrary and capricious standard to review its denial of benefits under this exception to eligibility. However, this language merely gives Exide the power to determine an employee's eligibility for benefits based on a "comparable" offer of employment.[8] Thus, Exide is, presumably, arguing that because the Separation Plan expressly grants it discretionary authority to determine whether an offer is "comparable," similar discretion is impliedly granted to determine whether an employee is eligible for benefits under the remaining terms of this exception.

■ The Third Circuit rejected this argument in *Luby v. Teamsters Health, Welfare and Pension Trust Funds,* 944 F.2d 1176, 1181 (3d Cir.1991). In *Luby,* the defendant argued that the Declaration of Trust's express grant of discretionary authority in specified areas of Plan administration, impliedly granted similar discretion in other unspecified areas of administration. *Id.* The court ruled that the "express grant of discretion in certain areas of Fund administration and silence as to others strongly supports the conclusion that had the settlors intended to grant discretionary authority in the [unspecified areas], they knew how to say so and would have expressly done so." *Id.* Likewise, in the instant case, the Separation Plan's express grant of discretionary authority to determine whether an offer of employment is comparable and silence as to the power to make such determinations under the remaining terms in the exception, strongly supports the conclusion that Exide's intent was to limit its discretionary authority to a determination of whether an offer is comparable.[9] Accordingly, to the extent Exide's

---

7. Every ERISA plan must have an administrator. The Separation Plan failed to designate any administrator. Thus, Exide, as the Plan's sponsor, is deemed to be the administrator by operation of law. 29 U.S.C. § 1002(16)(A).

8. We find this grant of discretionary authority is sufficiently broad to include determinations of fact in regard to the terms of the offer.

9. In a broad sense, the proximity of a job to an employee's home is a consideration in any determination of whether an offer of employment is

denial of benefits was based on a comparable offer of employment, its decision will be reviewed under the arbitrary and capricious standard. Exide's determination of Hardtke's eligibility under the remaining terms in this exception will be reviewed de novo.[10]

The parties do not dispute that the Separation Plan neither expressly nor impliedly grants Exide any other discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. Accordingly, we will also apply the de novo standard of review to Exide's additional determinations of Hardtke's eligibility under the remainder of the Separation Plan. We turn now to review Exide's denial of separation pay to Hardtke under the Separation Plan.

## C. SEPARATION PLAN

Exide denied Hardtke benefits under the Separation Plan on the grounds that its successor, the Richardson Division, had made him offer of continued employment with comparable duties, responsibilities, and compensation to the position that he had held with Exide's Stokes Division. The Separation Plan provides that "salaried employees who lose employment as a result of a reduction in staff or an elimination of their position or the lack of available work consistent with the employees' qualifications and capabilities," are eligible to receive separation pay. The Separation Plan lists seven circumstances for which an employee is disqualified from receiving benefits. One exception is for "[e]mployees who are offered comparable ... employment by the Company or any or its subsidiaries or affiliates...." Hardtke argues that Exide's denial of benefits under this exception was erroneous because 1. his position was eliminated upon the sale of the Stokes Division to Richardson, 2. the "Company", Exide, its subsidiaries, or affiliates never made him an offer of employment and 3., in the alternative, that the Richardson offer was not comparable to the position that he held at Stokes. Exide contends that Hardtke is not entitled to benefits because 1. the terms "Company, subsidiaries, and affiliates" includes Exide's successor, Richardson; 2. the Richardson offer was comparable to the position that he had held with Exide's Stokes Division; and 3. when the Company's successor provides employment in the very same position, the employee does not even fall within the Separation Plan's provisions since the employee does not "lose employment as a result of a reduction in staff or an elimination of [his] position or the lack of available work...."

 A court will go beyond the plain language of a benefits plan only if a determination is made that one or more of the terms are ambiguous. *See, e.g., Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3d Cir. 1991); *Bokunewicz v. Purolator Prod., Inc.,* 907 F.2d 1396, 1401 (3d Cir.1990); *Frank v. Colt Indus., Inc.,* 910 F.2d 90, 97–99 (3d Cir.1990). A writing is ambiguous if it is reasonably susceptible to different interpretations. *Taylor,* 933 F.2d at 1232 (citation omitted). In determining whether the terms at issue are ambiguous, a court must consider "the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings." *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 101 (3d Cir.1986) (citation omitted). An ambiguity determination is a question of law. *Taylor,* 933 F.2d at 1232 (citation omitted).

Here, the parties have offered very little evidence to aid us in our determination. We have before us the terms of the Separation Plan, their alternative understandings, and

---

comparable. Thus, arguably, the Separation Plan's express grant of discretionary authority to determine whether an offer is comparable extends to Exide's determination based on the offer of employment being "less than thirty-five (35) miles further from his residence." However, the Separation Plan distinctly expresses this factor as an additional criteria for determining eligibility under this exception and is, therefore, outside the scope of the term "comparable." Accordingly, for the reason stated above, discretionary authority does not attach to determinations based on these terms.

10. We note that these respective standards also apply to the review of Exide's decisions to the extent they were based on factual determinations. *See Luby v. Teamsters Health, Welfare and Pension Trust Funds,* 944 F.2d 1176, 1182–84 (3d Cir.1991).

evidence that approximately 5 or 6 other employees of the sales and production staff at Stokes, who were also offered employment with Richardson in Clark, New Jersey, were not paid separation pay under Exide's Separation Plan. However, these occurrences took place during the same time period in which Hardtke was denied separation pay. Additionally, the record is unclear as to whether Exide was even called upon to construe the Separation Plan as to these employee's eligibility for benefits because no evidence was presented that these employees ever applied for benefits. Accordingly, we find Exide's extrinsic evidence to be of inconsiderable value.

In making our determination, we are guided by two Third Circuit Decisions. In *Anderson v. Pittsburgh–Des Moines Corp.*, 893 F.2d 638, 640 (3d Cir.1990), the parties disputed whether the term "Company" as used in a benefit plan included a predecessor of the current employer. The court reasoned that the term "Company" was ambiguous on the grounds that the term was not defined in the plan and that the plan could reasonably be understood as using the term to refer either to the predecessor or to the current employer in various sections. *Id.* Second, in *Ulmer v. Harsco Corp.*, 884 F.2d 98 (3d Cir.1989), the Third Circuit construed a severance plan in the context of a going-concern sale. The defendant, Harsco Corporation, had issued a severance pay policy that provided, in relevant part, that:

> To further our concept of career employment, the Company will take all practical steps to provide continuing employment, including attempts to arrange transfers if work becomes unavailable at the individual's normal workplace.
>
> However, occasions may arise where the Company will be unable to continue the employment of certain people or groups of people. In these instances, when employment is terminated, the Company will make reasonable effort to assist such person or persons in securing employment

elsewhere and will make severance payment. . . .

*Id.* at 99. The court found that although the language of the Plan was general, it was not ambiguous. *Id.* at 103. The court construed the language "continuing employment," as used in the context of the Harsco's Severance Plan, to mean employment with the Harsco's Casting division, not with an acquiror of the Casting Division. *Id.* at 102. Thus, the court stated that it was "apparent" that Harsco fails to continue employment and severance pay was due when an employee "is terminated from Harsco's Casting Division, not when s/he is moved from the relevant work environment." *Id.* at 103. In refusing to find an implied exception to eligibility, the court explained that the Plan provided several exceptions and "under the principle of *expressio unius exclusio alterius* that other [exceptions to eligibility] such as going concern were not intended." *Id.* at 103–04. *See also Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498–99 (11th Cir.1987) (finding denial of benefits on the basis of a going concern was arbitrary and capricious where no such exception existed in the Policy and unambiguous language indicated that an employee was eligible if his job was eliminated and a new assignment could not be found within the original Company); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1354–55 (9th Cir.1984) (employees of purchased company entitled to severance benefits where plan unambiguously provided for such pay when jobs were eliminated and alternative employment opportunities were unavailable within the original Corporation), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Chacosky v. Hay Group*, 1991 WL 12170 at *5–7 (E.D.Pa.1991) (relying on *Ulmer v. Harsco Corp.* to find "elimination of position" unambiguously meant with the defendant, Hay Group, so that the plaintiff was entitled to severance benefits in a going-concern sale).[11]

■ Exide's Separation Plan is readily distinguishable from the plan in *Anderson v. Pittsburgh–Des Moines Corp.* and uses simi-

---

**11.** We note that the Third Circuit has found contrary holdings of other Federal Courts of Appeal addressing this issue to be unpersuasive. *Ulmer v. Harsco Corp.*, 884 F.2d 98, 104 (3d Cir.1989) (these cases were decided under the arbitrary and capricious standard of review and dealt with plans with different severance pay regimes).

lar language to the severance policy in *Ulmer v. Harsco Corp.* Unlike the plan in *Anderson,* the Separation Plan defines the term "Company" as the Exide Corporation and all references to the "Company" in the Plan could only be reasonably understood to refer to Exide. Following the reasoning in *Ulmer v. Harsco,* therefore, the Separation Plan should have been interpreted to mean the failure of *Exide,* its subsidiaries, or affiliates to offer comparable employment requires the disbursement of separation pay when employees lose employment "as a result of a reduction of staff or an elimination their position or the lack of available work . . . ," from *Exide,* not with its successor, the Richardson Division. Furthermore, in addition to the "offer-of-comparable-employment" exception, the Separation Plan provides six other exceptions to eligibility. Under the principle of *expressio unius exclusio alterius,* if Exide had intended an exception to eligibility for a going concern, the Separation Plan would have simply read the "Company, any of its subsidiaries, affiliates, or its successor."

In sum, the disputed language in the Separation Plan is not ambiguous. The term "Company" clearly refers to Exide and, according to the plain meaning of the Separation Plan, Hardtke lost employment as a result of an elimination of his position from Exide when its Stokes Division was sold to Richardson. Since *Exide, its subsidiaries, or affiliates* did not offer employment to Hardtke after the sale, Exide's decision to deny Hardtke separation pay under the "offer-of-comparable-employment" exception to eligibility was erroneous.[12] Therefore, it is unnecessary for us to decide whether Exide's construction of the term "comparable," to include the terms of the offer made by the Richardson Division, was arbitrary and capricious.[13]

Exide submits that Hardtke was additionally ineligible for separation pay under the Plan because the immediate reason for his separation from the Company was a termination. The Separation Plan provides that "[e]mployees terminated for misconduct, insubordination, fraud, dishonesty, willful neglect of duties, intentional damage of Company property, disclosure of confidential infor-

12. Exide's interpretation of the disputed language contradicts the plain terms of the Separation Plan. An interpretation that is in direct conflict with the plain wording of a benefit plan is compelling evidence of arbitrary and capricious behavior. *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495, 1498 (11th Cir.1987) ("[A]ny interpretation that contradicts the clear wording of the policy has to be arbitrary and capricious."); *Carr v. Trustees of Hotel & Restaurant Employees,* 585 F.Supp. 949, 952–53 (E.D.Pa. 1984) (Interpretation that is in direct conflict with express language of a plan is a " 'strong indication of arbitrary and capricious behavior.' ") (citations omitted). Accordingly, Exide's decision to deny Hardtke benefits under the "offer-of-comparable-employment" exception would not even survive an arbitrary and capricious standard of review.

13. We also find that a separate and independent ground exists for our determination that Exide's denial of benefits was erroneous under the "offer-of-comparable-employment" exception. This provision additionally requires that the offer of employment be "at a location which is less than thirty-five (35) miles further from [an employee's] residence than [his] last place of employment with the Company or are offered reimbursement to relocate to a place of employment which is greater than thirty-five (35) miles. . . ." Whether "thirty-five (35) miles" means actual

distance, as Exide suggests, or shortest route by road, as Hardtke presumably contends, is ambiguous on its face. The parties failed to introduce any extrinsic evidence to help us in determining their intent. The term is reasonably susceptible to either of the understandings suggested and having no other evidence to determine the parties intent, we are unable to resolve this issue. Thus, we are required to substitute a term which is reasonable in the circumstances. *Bruch v. Firestone Tire and Rubber Company,* 828 F.2d 134, 147–48 (3d Cir.1987), *rev'd on other grounds,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Because of the short distance involved and the type of employees at issue, salesman, who travel by car, we find that "thirty-five (35) miles" by the shortest route by road is the most reasonable substitution in these circumstances.

Above, we found that Richardson's Clark, New Jersey facility was 39 miles further from Hardtke's residence than his last place of employment with Exide in Trenton, New Jersey. Hardtke measured this distance on his car's odometer, using the most direct route. Further, Richardson never offered Hardtke reimbursement to relocate. Accordingly, even assuming *arguendo* that Exide properly interpreted the Plan to include offers of employment from Richardson and that such an offer was "comparable," its denial would still be erroneous under the "offer-of-comparable-employment" exception.

mation, or because of any other similar act detrimental to the Company ...;" are ineligible to receive separation pay. Hardtke contends that Exide's denial of benefits under this exception was erroneous because the circumstances under which he was terminated do not constitute a "similar act detrimental to the Company" within the meaning of the Plan. Exide argues to the contrary.[14] We now turn to review these circumstances.

▮▮▮ Hardtke was terminated for allegedly negotiating for a job with Hardigg Industries, Exide's primary competitor for the sale of industrial battery products, while still employed with Exide's Stokes Division, which, in Exide's judgment, was seriously detrimental to its Stokes Division. Exide was concerned because Hardtke had access to confidential marketing strategies and both Hardigg and Stokes called upon the same customers. Yet, Exide presented no evidence that Hardtke had ever revealed confidential marketing strategies to Hardigg or attempted to solicit customers away from Stokes. Nevertheless, Exide made a determination that for Hardtke to continue calling on customers while at the same time maintaining a relationship with Hardigg created a conflict of interest.

After Hardtke was unable to reach an agreement with Richardson as to the terms of his employment, then-President of Stokes, Arthur Koch, met with Hardtke to inquire whether he would seek employment with Hardigg. Hardtke admitted working for a competitor was a possibility that he had considered, as industrial battery sales was the type of work that he was familiar with. Additionally, Hardtke had learned of a possible opening at Hardigg through an inadvertent contact with a Hardigg salesman at the office of a mutual customer. However, we find that Exide's determination that Hardtke was negotiating for job with Hardigg while he was still employed by Stokes to be erroneous. Their determination was based solely on unsubstantiated rumor in the industry. Hardtke testified that prior to his termi-

nation on December 14, 1984, his happenstance conversation with the Hardigg salesman was his sole contact with anyone from Hardigg with respect to obtaining employment.[15] Thus, we must determine whether Hardtke's act of considering employment with Stokes' primary competitor, Hardigg, after he was unable to reach an agreement with Richardson, but while still employed at Stokes, constitutes a "similar act detrimental to the Company" under the Separation Plan.

▮▮▮ The terms "similar act detrimental to the Company" are ambiguous on their face. The interpretation of ambiguous plan provisions is a question of fact. *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3d Cir.1991). In identifying the intent of the parties as to the meaning of such terms, a court may consider the language of the plan, the reasonable understanding of the parties, past practices, customary usage in the trade, and other competent evidence bearing on the issue. *Id.* at 1232–33. Here, once again, the parties have failed to introduce any evidence, except the language of the Separation Plan and their contrary understandings of the meaning of the terms to include the circumstances under which Hardtke was terminated.

However, we can ascertain the meaning of these terms through the language used in the remainder of this exception. Thus, "similar act detrimental to the Company" means an act of malfeasance that is comparable in severity to "misconduct, insubordination, fraud, dishonesty, willful neglect of duties, intentional damage of Company property, [or] disclosure of confidential information...."

Hardtke, who was a salesman of industrial battery parts, was employed by Stokes for over 25 years. The industry for industrial battery products is small and limited with very few competitors. Therefore, after Hardtke was unable to come to an agreement with Richardson as to his employment, he was left with little alternative, but to consider work with a competitor. Moreover, industri-

---

**14.** There is no dispute that the remaining language of this exception does not apply to the circumstances for which Hardtke was terminated.

**15.** Hardtke testimony as to this fact was corroborated by the President of Hardigg Industries, James Hardigg.

al battery sales was the type of work in which he was experienced and qualified to perform. Hardtke was aware of a possible opening at Hardigg and considered this opportunity, as Hardigg, who was a major player in the industry, would likely offer him an attractive position. However, Hardtke did not pursue this potential opportunity until after his termination. Additionally, there was no evidence that he performed any acts of disloyalty, such as revealing Stokes' confidential marketing strategies. To the contrary, the then-President of Stokes, Arthur Koch, testified that Hardtke was a good employee, who served Stokes well and that he highly recommended him to Richardson. In short, we find that these circumstances fall well below a level of malfeasance that is comparable in severity to the acts described in this exception. Therefore, the circumstances under which Hardtke was terminated do not constitute a "similar act detrimental to the Company" under the Separation Plan.[16] Accordingly, Exide's denial of benefits under this exception was also erroneous.

### D. DAMAGES AND PREJUDGMENT INTEREST

Under the Separation Plan, eligible employees with one or more years of continuous service are entitled to a separation payment "of one week (1) of pay ... for each year of continuous service up to a maximum of twenty-six (26) weeks...." In the case of employees, like Hardtke, earning base pay plus commissions through a sales incentive plan, "pay" is defined as the average weekly earnings over the last twelve months prior to separation. The parties agree that the calculation of Hardtke's entitlement under the Separation Plan amounts to $20,000.35.

Hardtke has also requested an award of prejudgment interest. Exide contends that Hardtke is not entitled to prejudgment interest prior to June 7, 1991 because he was responsible for a substantial delay in bringing this action. An award of prejudgment interest to a prevailing party in an action arising under ERISA is within the discretion of the court. *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir.1992); *Schake v. Colt Indus. Operating Corp. Severance Plan*, 960 F.2d 1187, 1190 (3d Cir.1992). Such an award is to be granted based on "'considerations of fairness [and] denied when its exaction would be inequitable.'" *Ambromovage v. United Mine Workers*, 726 F.2d 972, 981–82 (3d Cir.1984) (citation omitted). A claimant's diligence in prosecuting an action is one factor a court may consider in exercising its discretion, *Pension Benefit Guar. Corp. v. Greene*, 570 F.Supp. 1483, 1503 (W.D.Pa.1983) (citation omitted) and, therefore, a court may fix the dates at which prejudgment interest should commence. *Valle v. Joint Plumbing Indus. Bd.*, 623 F.2d 196, 206–07 (2d Cir.1980).

In the instant case, Hardtke was less than diligent in pursuing his claim for benefits. He was denied separation pay on or about December 14, 1984, but waited four years until December of 1988 to file a Writ of Summons and did not file his Complaint until June 7, 1991. Under these circumstances, we will award prejudgment interest from December, 1984 to December, 1988 and from June, 1991 to the time of judgment in February, 1993. Hardtke has requested prejudgment interest to be calculated at a rate of 6% per annum.[17] Accordingly, based on the amount of damages, $20,000.35, a time period of five years and eight months, and a 6%

---

**16.** By our conclusion, we do not question Exide's business judgment in its decision to terminate Hardtke. In these circumstances, there was a very real *potential* of a conflict of interest. But we note that there were certainly less drastic alternatives, such as limiting his responsibilities and excluding him from new marketing strategies that he was not already familiar with. We merely find that these circumstances do not amount to acts similarly detrimental to Exide within the meaning of the Separation Plan. Exide had every right to exercise its business judgment to terminate Hardtke, but it does not follow that Hardtke's termination falls within the pa-

rameters of this exception merely because Exide believed that the circumstances for which he was terminated were seriously detrimental.

**17.** We recognize that the prejudgment interest rate in ERISA cases may be based on the post-judgment interest rate set forth in 28 U.S.C. § 1961, *Kay v. Thrift and Profit Sharing Plan*, 780 F.Supp. 1447, 1462 (E.D.Pa.1991) (citation omitted). Although this rate may well be greater than 6%, exercising our discretion, we limit our award to the relief requested.

interest rate, we award $6,799.32 in prejudgment interest.

## IV. CONCLUSIONS OF LAW

1. Hardtke's claim for separation pay is governed by ERISA, 29 U.S.C. §§ 1001–1461.

2. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(f).

3. Hardtke is a participant under Exide's Separation Plan and entitled to bring this action.

4. The de novo standard of review applies to Exide's denial of benefits under the Separation Plan, except to the extent the denial is based on an offer of "comparable" employment, which is reviewed under the arbitrary and capricious standard.

5. Under the plain meaning of the Separation Plan, Hardtke lost employment as a result of an elimination of his position when the Stokes Division was sold to Richardson and, was thus, eligible to receive separation pay.

6. The term "Company" unambiguously refers to Exide and, therefore, Exide's interpretation of the term "Company" to include Richardson was erroneous.

7. Since Exide, its, subsidiaries, and affiliates did not offer employment to Hardtke after the sale, Exide's denial of benefits under the "offer-of-comparable-employment" exception to eligibility was erroneous.

8. The circumstances under which Hardtke was terminated do not constitute a "similar act detrimental to the Company" under the Separation Plan.

9. Thus, Exide's denial of benefits under the "termination" exception was also erroneous.

10. Hardtke is entitled to $20,000.35 in separation pay under the Plan and, in our discretion, an award of $6,799.32 in prejudgment interest.